# United States District Court
## for the
## Southern District of New York

RECEIVED
SDNY PRO SE OFFICE
2023 JAN 24  PM 3: 03

| | |
|---|---|
| BENJAMIN LAGERSTROM, | Index No: _____ |
| | **COMPLAINT** |
| Plaintiff, | **Jury Trial Demanded** |
| v. | |
| ORSID REALTY, 61 WEST 9TH OWNERS CORP. a/k/a "WINDSOR ARMS", | |
| Defendants. | |

Plaintiff Benjamin Lagerstrom, *pro se*, as and for his complaint against Defendants, the business partners Orsid Realty and 61 West 9th Street Owners Corp. a/k/a "Windsor Arms", alleges as follows:

## PRELIMINARY STATEMENT

**"It should never be a function of your employment and it's not and by no means is your job in jeopardy."**

1.     This is a rare case of an alarming conspiracy where Defendants, employers of the Plaintiff in Manhattan, New York, a unionized doorman of 24 years, the work of whom they praised in writing until just days before they fired him, engaged in discriminatory practices and policy creations exclusively for and against the Plaintiff and meant exclusively for the Plaintiff, the only non-vaccinated employee at the worksite in order to terminate him, Defendants proving up by their own documented statements in undeniable evidence beyond the prima facie standard *as exhibited*

*here* that they misled Plaintiff's Constitutional Rights, knowingly violated employment laws and the Civil Rights Act, and cited Title VII of the Civil Rights Act in a bizarre letter demanding the Plaintiff explain to them where within Title VII he was not obligated to prove or disprove that a disability existed or that the Title issued him a right to religious or medical exemptions of any nature; Defendant board members include well known attorneys and a law professor.

**"You don't have to give me a doctor's note, just call me and tell me this is what they said and I'll clear it up with the board."**

2.      Plaintiff's employers made vile attempts with management to persuade the Plaintiff to undergo medical treatment that would prove or disprove a disability without "sending messages, just call(s)" to them and blatantly stated they knew they were violating the law and doing so for the purpose of discriminating against a non-vaccinated employee, that they understood they or "nobody for that matter" is lawfully allowed to make these type inquires, and threatened the unionized Plaintiff with their expressed and detailed illegal working relationship with his union, SEIU 32BJ, discussing in a recorded phone call with the Plaintiff that as management they sit on union committees including the committee to design vaccination policies for the union's contract with the workers, and that the Plaintiff should consider his "career path" in deciding whether or not to divulge the privileged medical data to them to prove or disprove that a disability existed; Defendant on multiple occasions recorded these conversations. (EXHIBIT "A")

3.      Defendants then for months emailed and called the Plaintiff to pressure him to receive full Covid-19 vaccinations despite guaranteeing him, in recorded phone calls per the aforementioned *Exhibit A* that he would be given an exemption but later sending him a certified letter stating the cause of his termination was because he did not get vaccinated and that constituted insubordination. (EXHIBIT "B")

4.      Defendants showed wanton disregard for discrimination laws by flatly stating the policy was based on a perception of employees who are not vaccinated being different than those that are, *see Exhibit A at phone call A, pps. 42, 52, 58, 72.*

**"I'm concerned about the board's perception of you for not being vaccinated."**

5.      The quantum meruit violations by the Defendants, who include high-powered real estate developers, multi-millionaire apartment owners, attorneys and others, against the Plaintiff's civil rights represent a very rare unlawful termination conspiracy featuring Defendant employers who knowingly disregarded employment law and quixotically decided to make blatant statements about their heinous behavior after receiving judicial knowledge about those acts being wholly unlawful, and further by affirming their deprivations of the Plaintiff's rights, stating incontrovertibly that the termination was solely for the purposes of the building board's "perception" of the employee and for no legitimate legal reason;

6.      Employers made many multiple documented statements that the Plaintiff was an outstanding and excellent employee and completely professional until just days before terminating him, citing that his termination was merited by the Plaintiff being "disrespectful" to the sum total of Defendants in not following a proven unlawful and discriminatory policy designed solely for him and nobody else.

**"I have to formally ask you and the board at Windsor to immediately cease and desist from any further inquiries regarding my medical status or religious beliefs."**

7.      The Defendants received and affirmed their understanding of the codified Federal Laws concerning a non-government and non-healthcare industry employee's rights to divulge privileged medical information and how this relates to vaccinations, received knowledge that the Plaintiff was the only person at the worksite who was not vaccinated, received multiple religious and medical exemption letters from the Plaintiff including from his doctors, stated "union law"

allowed them to create and implement a policy "for all employees" at the worksite to determine

who was and who was not vaccinated, despite having this knowledge prior, and knowledge prior

that the changes to the union contract—with zero input or vote from its members—were not

mandatory, not for every employee of the union or signatory building to the agreement,

unenforceable by law and that they held no authority to implement them as they did against the

Plaintiff, including all the Defendants receiving letters from the Plaintiff demanding they quit

making inquiries to prove or disprove if a disability exists and to stop their demands that he visit

with doctors they desired to introduce him to for this illicit purpose. (EXHIBIT "C")

8.     Defendants then gave the Plaintiff a deadline that expired four days after his

termination to provide them with the sensitive medical data, made estranged demands that he

provide them with personal clergy and church members' data to "prove" his sincerely held religious

beliefs, and then fired him claiming he refused to engage in "a discussion" with them about the

wholly discriminatory policy, after he had engaged in months of emails and phone calls with them

about same, showing them that none of the policies they implemented only for him to follow for not

being vaccinated presented an absolutely zero di minimis cost burden, as revealed in the

aforementioned *Exhibit C*.

## JURISDICTION AND STANDING

9.     This action arises under the Civil Rights Act of 1964 including but not limited to

Title VII of the law, the First and Fourteenth Amendments of The United States Constitution. This is

an enforcement and relief action to correct the unlawful employment practice of retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq.

("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

10.    The court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331 and

1343.enue in proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiff resides in,

the collective Defendants work and transact business or live in, and all events or omissions giving

rise to Plaintiff's claim occurred in this District.

11.     This matter is an important affirmation of the codified laws concerning Covid, which are made law by their actual entry into The Americans With Disabilities Act ("ADA") and are the same guidelines of the Centers for Disease Control ("CDC") that the Defendants continually claim merits their unlawful actions here. Although this matter details deprivations of Federal Covid laws, those deprivations are parcel only to the discrimination mechanisms the Defendants used to harm the Plaintiff for which Plaintiff brings these claims.

12.     All Defendants have seized their corporate authority over the Plaintiff during the time and events this complaint describes by their admission that they understood these laws but knowingly violated them.

13.     This court is authorized to grant Plaintiff's prayer for relief pursuant to Rule 65 of The Federal Rules of Civil Procedure.


## ADMINISTRATIVE PROCEDURES

14.     As required with the filing of this complaint, Plaintiff has received a notice of right to sue issued by The United States Equal Employment Opportunities Commission on his charge alleging violations of Title VII of the Civil Rights Act of 1964, The Americans With Disabilities Act, and violations of the Federal and New York State Constitutions.

15.     Plaintiff has complied with all other prerequisites to filing this action.


## THE PARTIES

16.     Plaintiff Benjamin Lagerstrom was a doorman for the Defendants at their building 61 West 9th Street. At all relevant times Plaintiff was an "employee" and/or "eligible employee" of Defendants under all applicable statutes. Plaintiff resides in New York, NY.

17.     Defendant Orsid Realty is a New York company with its headquarters in New York, NY, at all relevant times times the Plaintiff's "employer" and/or "covered employer" under all applicable statutes.

18.     Defendant 61 West 9th Street Owners Corp. a/k/a *The Windsor Arms*, is a New York company with its headquarters in New York, NY, at all relevant times times the Plaintiff's "employer" and/or "covered employer" under all applicable statutes.

## BACKGROUND AND GENERAL ALLEGATIONS

19.     Plaintiff brings this action after exhausting all possible remedies. Defendants have expressed and proved up a working relationship that colors fully unclean hands by them in their management of Plaintiff's bargaining agreement with 32BJ, an unlawful example of union-busting that proves conspiracy with the union and other Defendants in exhibited evidence detailed herein.

20.     Plaintiff had attempted on multiple occasions to resolve these matters amicably with the Defendants, and all Defendants have refused to cooperate in any way whatsoever to settle this matter.

21.     Plaintiff was a doorman for the Defendants in their building 61 West 9th Street, New York, NY, and began employment there in January 2010 part time while he worked full time for a different company since 2001.

22.     The total of all policies and events described herein are the result of the combined negotiation and decision making process of all the Defendants Orsid Realty, 61 West 9th Owners Corp. a/k/a "Windsor Arms" with the ulterior motives of securing financial gain via establishing a tax shelter for themselves in seeking certification from the City of New York that they had a 100% vaccinated staff, and challenging religion and civil liberties.

23.     Defendants identified and utilized specious criteria and methodology for determining Plaintiff's religious beliefs and to discover medical information not allowed by Title VII, which they strangely reference in their communication seeking this:

    a) they would identify Plaintiff's other concerns relative to his religious and medical

    concerns and then weigh the two; and b) they would seek evidence or support in abhorrent

    fashion from both doctors and Plaintiff's parish as to their beliefs and concerns to validate

his own beliefs and concerns. This methodology was reflective more of an antipathy toward religious and medical accommodations than a search for truth.

24.     Defendants approached the Plaintiff to "jump" to Windsor in October 2020 for a full-time position as night-shift doorman, and the Plaintiff resigned from his full time position at the other company and filled the vacant position for the Defendants. He was made guarantees by Defendants that his tenure would be honored and that he could remain employed there until retirement and would never be fired for not being vaccinated. *Please refer to the aforementioned Exhibit A, phone call A at pp. 58.*

25.     Upon Plaintiff entering into the unionized full-time position as night-shift doorman, Defendants notified 32BJ that Plaintiff had "jumped" from his prior employer to their companies. Defendants issued 32BJ dues deductions from his wages in what appears to be the employers signing the Plaintiff's name to authorization forms without his permission to do so immediately upon hiring.

26.     Plaintiff was not granted any type of seniority at the job site despite being a far more experienced employee than all other employees at the site, as is standard practice and implemented elsewhere in other union buildings. He received a part-timers Christmas bonus although signing full-time.

27.     During the Covid-19 Pandemic height, Plaintiff received an emergency stipend unequal to the other doormen employed at the site, approximately $400, while a relative of Defendant employer Orsid, Jason Taveras, also employed as a doorman at the site, received $2,500. Taveras had minimal experience in the position and track record of discipline continually for acts ongoing, and was paid handsomely to negotiate and pressure Plaintiff for the purposes Plaintiff brings this suit against the Defendants.

28.     Since the very first day of full-time employment Defendants repeatedly urged Plaintiff to step into the position of Danny Santos, an African-American employee who worked as an afternoon doorman and had a history of disciplinary measures utilized against him after disputing that he had been denied a permanent position that was filled by a light-skinned employee of far less

experience on the basis of race, despite Santos having legitimate hiring preference for the position based on tenure;

29.     The building board constantly informed the Plaintiff that they wanted him in the more visible afternoon shift and that they would discipline Santos until he moved to the graveyard shift, citing his skin color as cause. Plaintiff always declined involvement in this and the afternoon shift, stating unequivocally that he would prefer to work the night shift until he "runs to the door", an industry term for retirement.

30.     When the Covid 19 pandemic reached it's first high "curve" Defendants implemented policies for employees and began to inform the Plaintiff that they would have the authority to change shift hours and switch employees' shift positions without their agreement on the basis of "which employee by their contact with the public engaged more with residents and people", a completely incomprehensible standard, and that based on this weird measurement they could "force" Plaintiff and co-worker Santos into changing their shifts; Plaintiff challenged this heavy handed tactic via email to Defendants.

31.     Beginning in March 2020 as part of the policies implemented by the Defendants, full-time and some part-time employees were required to participate in semi-regular conference calls with company agents Robert Melman and Bianca Taveras during which the employers spoke of and ascertained the vaccination status of all employees, who had been infected with Covid and who had not, what residents had Covid, who employees were to allow entry into the Windsor building for due to the pandemic, who they were to refuse entry to, which residents and visitors had to wear masks, the requirements for reporting residents that "appeared" to have Covid or its symptoms to the companies, how and who employees were to talk to residents about those that appeared to, or were confirmed to have Covid, who they should and should not report for rules infractions in bias, how they interpreted the laws about Covid, and that they were negotiating with the union and awaiting instructions from the union regarding mandating vaccinations. (EXHIBIT "D")

**"I would just hate to see it come to this because, you know because of individual opinions, it should never be a function of your employment and it's not and by no means is your job in jeopardy… nor will you ever be disciplined for you know not getting a vaccine or for talking to the union"**

32.    Defendants' agent Melman later stated in a controlled phone call that he was on the

32BJ union's committee and multiple union committees for his "own company" to design the Covid

workplace policies. Please refer to the aforementioned Exhibit A, stating partially:

> "Yeah as soon as you can just let me know and again I, I'm not trying to press you what I'm trying to, what I'm trying to avoid is the, the subjectivity that goes into these things, you know we can live and die with the union book but I think over there where you're so well liked, and I'm so impressed and Bianca is with the quality of your work, I would just hate to see it come to this because, you know because of individual opinions, *it should never be a function of your employment and its not and by no means is your job in jeopardy or anything like that* but at some point the board has already asked if there's anything that can be done with a carrot or a stick and there's nothing that can be done with a stick, there are things that can be done to incentivize individuals." *(Emp. Ad.) at Phone Call A, pp. 58*

> "It is, they are crazy times its unprecedented, uh but my point is that I'm not concerned about the union at all *nor will you ever be disciplined for you know not getting a vaccine* or for talking to the union, I mean that's what you pay your union dues for and I'm a big supporter of that..." *(Emp. Ad.) at Phone Call A, pp. 72*

33.    Defendants' agent Melman, speaking on behalf of the companies as agent, outlined

that exemption terms for medical reasons would begin and end on the Plaintiff's word and word

alone, and proved up the discrimination of the Defendants against non-vaccinated employees,

showing the vaccination policy had nothing to do with safety or health, rather how company owners

feel about people who invoke their equal rights, please refer to the aforementioned Exhibit A,

stating partially:

> "If you came back to me and said my doctor's advised against it, at that point what I'd do is I would tell the board, only the board, that I had an off the record conversation with you and you've been advised not to get it, and it would kind of close the book on it and it would eliminate some of the negative I guess connotations that are associated with non-vacciners for you to do it this way." *at Phone Call A, pp. 52*

**"When it first became available I did the same thing with my doctors at Sloan, and they were like no by all means you're absolutely better off getting it um, but they certainly didn't mandate that I do it, nor did my company for that matter mandate that I do it."**

34.    When multiple employees, none the Plaintiff, became sick with Covid, during the

conference calls but not exclusively in that forum Defendants began to inquire as to the vaccination

status of all employees assigned to Plaintiff's building, and offer incentives for employees to get

early vaccinations including paid time-off. This policy was not uniform, as Defendants' agent

Melman later stated in a controlled phone call explaining only *some* employees would be subject to

a vaccine mandate. Please refer to the aforementioned Exhibit A, stating partially:

> "Yeah, um, well, for example if you called the union and said I got a call today from the managing agent and they were trying to coerce me into being vaccinated, I'd get a call and I wouldn't answer it and it certainly wouldn't be a huge deal, ha ha, and I'm not trying to coerce you but I do think that and where I'm going with this is that I would suggest to you and it's just a suggestion that you do speak to your doctors… if you want to, you know verify if it warrants that your auto-immunity in fact, but when it first became available I did the same thing with my doctors at Sloan, and they were like no by all means you're absolutely better off getting it um, but *they certainly didn't mandate that I do it, nor did my company for that matter mandate that I do it.* I got it because I thought it was the right thing to do but people have different political views on it also which is a whole other conversation--" *at Phone Call A, pp. 52*

35.     Long before designing a policy in November 2021 that claimed it's purpose was to

ascertain which employees at the site had been vaccinated, Orsid and Windsor had already obtained

that data, and designed the policy specifically for the Plaintiff to force him to vaccinate based on

how board members perceived him.

36.     Long before designing this policy, part of its stated purpose being to collect the

vaccine "passport" cards of all vaccinated employees, Defendants had already collected copies of

those cards.


**"I'm not concerned about the union at all, in fact I sit on a committee with the union, and one of the things I'm doing with my own company is helping to put together a protocol for Covid."**

37.     Defendants unabashedly applied unlawful intimidation practices as stalking horses to

The Civil Rights Act by attempting to impute to the Plaintiff, a person they believed to be a simple

doorman, that they were collaborating with state actors from the Plaintiff's union in rackets that

gave them the same authority as state actors and excessive authority even beyond that possessed by

the union.

38.    In amazingly brazen fashion, Defendant's business agent Bianca Taveras, subsequent of her attempt to mislead the Plaintiff of his rights by insisting that union policies and their private policies are "law", threatened the Plaintiff to "facilitate" an invitation on his behalf to his union delegate, to begin arbitration hearings. (EXHIBIT "E")

39.    The Defendants have shown a clear and residual attempt to intimidate the Plaintiff into believing the only administrative body that could assist him in protecting his rights is his union, was corrupted by their influence and that they are partners with the union and have authorities that grant them access to fixing arbitration hearings, canceling employee pensions, and having their "work tickets" pulled.

40.    Defendants applied overbearing pressure on Plaintiff's mental state by threatening his employment and financial status and juxtaposing those threats with "silver or lead" offers ala mafia gangsters including "promoting" him to higher positions that would require he "leave" the union.

> "I'm not concerned about the union at all, in fact I sit on a committee with the union, and one of the things I'm doing with my own company is helping to put together a protocol for Covid. Its not that I'm concerned about the union at all, and if you did speak tot he union you'd have every right to you'd you know the, the I mean the crazy part is my wife who's in the union, you know the nurse's union as a front-line worker, she's never been mandated to even be tested, which I think is insane. I guess the reason for that is because they don't want to know." *at Phone Call A, pp. 68*

**"I would also tell you, from your own career path perspective, once things settle down a bit, jump on some of those courses that the union is offering, I'm on the curriculum committee and some of those courses would be very good for your career path."**

41.    Defendants offered preferential treatment to Plaintiff with the caveat that he quit his filings and complaints with the NLRB, The New York State Commission on Human Rights and the union, *and that he get vaccinated.*

42.    In a controlled phone call Defendant agent Melman proves up that the company violations against Plaintiff's rights are because he was not vaccinated and invoking his rights, *please see the aforementioned Exhibit A, which states partially:*

"No, no I'm serious and everybody is very please, I'm very pleased and so is the board, we're certainly pleased with the quality of your work. You should know that, and I'll tell you that up front, I don't have to tell you that but I'm telling you that because it's true. What was troubling to me up until we had this conversation was the fact that, um, in as much as we live and die with union rules and rules all over the place, there's also a lot of subjectivity for that, for lack of a better word into what we do, and people's perceptions mean everything when you're in a small building like yours." *at Phone Call A, pp. 42*

"...the board has already asked if there's anything that can be done with a carrot or a stick and there's nothing that can be done with a stick, there are things that can be done to incentivize individuals." *at Phone Call A, pp. 58*

"That's all I'm asking." *at Phone Call A, pp. 60*

"It is. They are crazy times its unprecedented, uh but my point is that I'm not concerned about the union at all nor will you ever be disciplined for you know not getting a vaccine or for talking to the union, I mean that's what you pay your union dues for and I'm a big supporter of that. I'm not concerned about the union, I'm really more concerned about, you know the bottom line is I'm concerned about your, the way that you're being perceived in the building, the objectivity, you know the subjectivity that goes along with it--" *at Phone Call A, pp. 72*

"I would also tell you, from your own career path perspective, once things settle down a bit, jump on some of those courses that the union is offering, I'm on the curriculum committee and some of those courses would be very good for your career path." *at Phone Call A, pp. 78*

"You know, I'll tell you my, my wife's cousin actually was working for the same company for about twenty years, she was also working for the same company, they have a disabled child and his boss came in one day, it's a small company, and said 'I just sold the business', you guys have 90 days, I'm going to cover your insurance for 90 days um, and again, this guy was in his 50s, you know he didn't have a great job but it was paying his bills, and he found himself with nothing. I gave him a doorman's job and he's making money than her ever made, his benefits are great... [inaudible]... and he's got the job security--" *at Phone Call A, pp. 82*

"No no no. It's more than that because the union, you, you...[inaudible] pays the bills but I'm talking about long term in your career that you'd be a great resident manager unfortunately sometimes you have to go back a little to get there, you know I could get you a job you know in a smaller building or something like that... [inaudible] ... you'd fit in because you understand the communication and you've been able to demonstrate that to me, I'd absolutely think that you, you're a candidate for a manager's job somewhere here... [inaudible] ..." *at Phone Call A, pp. 86*

**Defendants ask employees to sign the New York Hero Act, threatening disciplinary action for those that did not, making judicial admission they held no authority in law to mandate vaccines and enhancing Plaintiff's rights in standing here.**

43.    Long before implementing the premature and bogus vaccination policy Orsid and

Windsor forced all employees to sign the "New York Hero Act", stating that failure to sign the act

would result in disciplinary action up to and including termination; Plaintiff signed it with a statement next to his signature that read "Under Duress".

44.     Quixotically the hero act detailed that the employee would have to participate in all safety measures issued by *government* officials *authorized* to order their participation, not private companies or individuals or by Union 32BJ's safety measures that only applied to a certain few-type of employees at the discretion only of the owner boards of the individual buildings, all of those proven here as unlawful. *Please refer to the aforementioned Exhibit C.*

45.     When asked to engage in discussion with Defendants concerning legal authority, the Plaintiff replied and issued letters via email and otherwise that responded to those inquiries, the *aforementioned Exhibit C.*

46.     Defendants never initiated a policy to confirm or deny if construction workers, domestic workers, contractors, visitors and others entering the building were vaccinated and never instructed the full-time Windsor employees to seek proof of vaccination for such.

47.     Defendants never initiated a policy to confirm or deny the vaccination status of building residents, only if they were sick.

48.     Plaintiff began to receive overtures from building residents, some of them building board members charged with voting on the design and implementation of building policies that include this, on or about July 2021 concerning his plans to get vaccinated or if he was vaccinated, expressing to the Plaintiff that he should undergo medical examinations alternate to his regular doctors to determine if vaccines were dangerous or not for him to receive. These obnoxious and incessant inquiries continued through his final days working there.

**"It's not Ben, you know, against or opposing us."**

49.     Defendants made unlawful inquiries into Plaintiff's medical status in a true misleading of his Constitutional Rights, Defendants' agents Melman and Taveras pressuring

Plaintiff in a controlled call to prove or disprove if Defendant has a pre-existing medical disability.

Please refer to aforementioned Exhibit A at, that states partially:

> I'm not trying to coerce you but I do think that and where I'm going with this is  that I would suggest to you and it's just a suggestion that you do speak to your doctors... *at Phone Call A, pp. 44*

> "Well I'm even willing, because if you came back to me, and I wouldn't ask you for a note, if you came back to me and you said 'Rob my doctor really advised against it', I would have no issue at all, I don't think that would be the case based on you know the medical professionals that I've been speaking to, including my, uh my wife... ha ha... If you came back to me and said my doctor's advised against it, at that point what I'd do is I would tell the board, only the board, that I had an off the record conversation with you and you've been advised not to get it, and it would kind of close the book on it and it would eliminate some of the negative I guess connotations that associated with non-vacciners for you to do it this way." *at Phone Call A, pp. 48, 52*

> "And you know the board is just very keen um, on making sure that the staff is vaccinated or pushing for the staff to be vaccinated, they very much so want staff to be vaccinated. So um, I know from Rob you were checking with your doctor and there was just some clearance--" *at Phone Call B, pp. 21*

> "So, and I apologize if the residents are prying and somewhat harassing you guys in general, I know we made a point to discuss that with the board who did bring it up at the annual meeting of shareholders and did let residents know they should not be inquiring as to your vaccination status or ask personal health questions like that so I apologize if that's happened, I do want to be able to tell, report to the board that you and I spoke and be able to say to maybe put a time frame on it, like, I don't think I'm hearing that you're opposed to the vaccine, I don't know if its safe for you, are you opposed to getting it?" *at Phone Call B, pp. 33*

> "Do you have a doctor that you can talk to because I mean even if that's the case we can present that to the board and say look, this is from his doctor, you know this is the doctor's opinion, *it's not Ben, you know against or opposing this,* you know they are putting more pressure on us and you know things are gonna, people are gonna start feeling more pressure from the union from everywhere and they do want us, you know if you're not vaccinated we would have to implement testing and [inaudible] the vaccination." *(Emp. Ad.) at Phone Call B, pp. 39*

> "If you were able, yeah do you have like an appointment set up, someone to see or are you still researching a doctor--" *at Phone Call B, pp. 41*

> "Yeah, I mean, I'd just like to get to, report to the board, and I don't want to, my intent is not to pressure you, push you, I would never want to force someone to do something, it's completely your decision at the end of the day, I just want to be able to report to the board accurately on what they can expect and if that's the case I can just say you're getting an opinion from your doctor." *at Phone Call B, pp. 45*

**Plaintiff is the only employee at the site to be ordered to undergo weekly Covid testing and threats of termination continue.**

50.     Defendants then ordered Plaintiff undergo weekly covid testing, an order *issued against threat of termination*, implemented solely for the Plaintiff and no other employee of his type at Windsor, a clear showing that Defendants knew all other Windsor employees had been vaccinated.

51.     *The aforementioned Exhibits C and D* spell out termination terms, issued 11/7/2021, the threat is illuminated via the written communication of the total Defendants to the Plaintiff stating failure to vaccinate would result in a series of quixotic disciplinary procedures including paid and unpaid leave, furloughing, placement on employee "recall" to duty lists in the same *or similar* work positions, and complete "separation" from employment; they demanded employees receive two vaccination shots and, in a bizarre showing of complete disregard for civil liberties, spelled out terms for employees to request religious and medical exemptions, both of which had been issued in full accordance with law by the Plaintiff prior to the "new" policy, with no intention at all of issuing *any* exemptions to vaccinations.

52.     Extremely noteworthy is Defendant's correspondence soliciting not objection or inquiry into Plaintiff's religious sincerity and medical status, but rather private church parishioners data and the Defendant's continual insistence that doctors they appoint intervene and join a discussion about the Plaintiff's private medical information, discuss his opposition to vaccination, and decide for him what accommodations would be acceptable from religious and medical points of view.

53.     These threats were deceitfully addressed to all employees at Windsor who did not present vaccination "passport" cards to the Defendants by 11/8/2021, but were obviously only for the Plaintiff, as this data had already been obtained and discussed from other employees.

**Plaintiff paid the entire cost of his covid testing, vacating any efforts by the Defendants to construe a cost-burden defense for violating his rights.**

54.     Although Defendants offered Plaintiff to arrange weekly Covid testing for him, Plaintiff insisted on arranging the tests on his own, paying their entire cost out of his own pocket, and doing so on his free-time and the Defendants bore a sum-zero di minimis cost burden in testing.

55.     Plaintiff never contracted Covid.

56.     Policies implemented by Defendants for both vaccinated and not vaccinated employees such as the use of masks, gloves, cleaning procedures, social-distancing procedures, et al. bore a sum-zero di minimis cost burden to Defendants from Plaintiff, equal with every other employee.

57.     None of the Defendants are known to be nor have ever informed the Plaintiff that they are government officials with the credentials and authorization to order an employee be vaccinated.

58.     None of the Defendants are known to be nor have ever informed the Plaintiff that they are medical doctors with expertise in vaccinations.

59.     Plaintiff repeatedly informed the total of Defendants agents and representatives via email that they were to cease and desist the medical and religious inquiries and explained with merit that they were obligated by law to issue the exemptions requested and that all further requests for documentation and information regarding these exemptions were not only redundant, as what was requested of the employees had already been issued in full, but also a further violation of civil rights.

60.     On or about November 2021 Defendants were informed that Plaintiff filed a grievance with the National Labor Relations Board ("NLRB") against the 32BJ Union that detailed his discussions with the Defendants and their claims to be working in tandem with the union to create policies that altered Plaintiff's bargaining agreement without his or other member participation; Defendants admitted this as cause for retaliation against the Plaintiff and as cause for

him to participate in further unlawful investigations, searches and seizures as a condition of his employment. (Exhibit "F")

61.     Again, having properly sought both religious and medical exemptions, Plaintiff asked that Defendants stop the heinous private inquiries of Plaintiff's protected statuses.

62.     Defendants then utilized intimidation tactics by once again invoking their connections to the Plaintiff's union stating both the union and a private realty board supported their acts of bias against the Plaintiff, imputed deceitfully that this was the law and not only a policy, and pressured the Plaintiff to divulge protected information he is not obligated to provide and to continue doing so, misleading him that he *is obligated* to do this to keep his job:

> "We are in receipt of your "cease and desist" and letter of complaint to the NLRB, which was received in response to The Windsor Arms request for additional information to support your request for medical and religious reasons..." *Exhibit F, at pp. 1*

> "The memorandum of agreement (MOA) between SEIU 32BJ and the Realty Advisory Board authorized the implementation of vaccine mandates by residential boards and supports the process of acquiring supporting information for medical and religious exemptions." *Exhibit F, at pp. 4*

> "We welcome the opportunity for a collaborative discussion as you seem to misunderstand the MOA and The Windsor Arm's intentions and *your obligation.*" *(Emp. Ad.) Exhibit F, at pp. 5*

63.     The Defendants continued to harass Plaintiff both at home and in the workplace, sending messages to him through intermediaries, visiting him and calling him at work and continuing in all ways with the illegal medical and religious inquiries.

**"This letter shall memorialize your termination of employment...Your employment is terminated due to your misconduct... You have refused to cooperate... with regard to your employer's vaccination mandate..."**

64.     Plaintiff, concerned that some of the data regarding the discussions between company agents and owners was not being made available to all parties, issued a full accounting of the communication between himself and agents Melman and Taveras to all parties and noted to all parties that their agents had negotiated on their behalf under their supervised authority and promised

him he would never be disciplined and/or fired for not getting vaccinated and that their private policy was not legal.

65.    Plaintiff was informed by company agent's brother Jason Taveras, a co-worker, that he should make plans to find another job and that Taveras would be stepping into his shift temporarily when his sister, Orsid agent Bianca Taveras, fired him.

66.    The following Saturday he was terminated for not following the vaccine policy and being "disrespectful" in issuing the data of communication and information about the law.

67.    In a letter memorializing his termination, Defendants noted his refusal to follow their unlawful policy against his rights constituted insubordination and was the reason he was fired, *the aforementioned exhibit B.*

68.    Plaintiff has never been disciplined or written up for anything during his time working for the Defendants. Just days prior they had praised his work in a series of emails.

## FIRST CLAIM FOR RELIEF

### (Retaliation)

69.    Since at least October, 2021, Defendant has engaged in unlawful retaliatory practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) by terminating the employment of Mr. Lagerstrom because he opposed unlawful discriminatory practices and believed he participated in a union inquiry and learning he filed a complaint with the National Labor Relations Board.

70.    The effect of the events described above has been to deprive Plaintiff of equal employment opportunities in retaliation for exercising his federally protected rights.

71.    The unlawful employment practices described above were intentional.

72.    The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

73.     The unlawful employment practices described above have besmirched and irreparably harmed the image and reputation of the Plaintiff in the building services industry and the community he worked dutifully in for a near quarter century, he has been "blacklisted" in his industry and suffers everlasting unnecessary inquiries about the nature of his termination, his personal character and his "danger" to the community; he is also the victim of a false narrative that portrays his termination as for reasons other than the cause given, and his trade is now stigmatized beyond repair.

74.     The unlawful employment practices described above have stigmatized Lagerstrom by revealing to every single potential employer he may encounter that he is not vaccinated the *moment* they inquire as to the cause of his termination by Defendants, he is thereby heavily impacted against his rights by being denied the important federally protected right of seeking religious and/or medical exemptions and invoking other federally protected rights, including The Civil Rights Act of 1964; to make him whole again will require partly that the court determine his firing was illegal and unjustified.

## **PRAYER FOR RELIEF**

The Plaintiff, having met the threshold standards of intentional discrimination respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendants, its officers, successors, assigns and all persons in active concert and participation with it from engaging in any employment practice which retaliates further against Lagerstrom who complained about discrimination.

B.     Order Defendants to make whole Lagerstrom by providing him appropriate back pay, front pay and other relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to:

**Back Pay**
$59,085.04
(Itemized as $1,055.09 X 56 weeks since date of termination thus far, the current wage.)

**Front Pay**
$2,399,563.92
(Itemized as $59,085.04 per year X 22 years until mandatory retirement since date of lawsuit filing adjusted at a rate of 3% per year increased until the final year.)

**Contributions to Medical, Dental, 401k Funds**
79,985.47
(Itemized as 30% of total yearly salary until retirement, $2,399,563.92 / 30)

**Pension Payment**
1,919,651.14
(Itemized as 80% of total yearly salary after retirement $2,399,563.92 / 30 for 20 years)


C.      Order Defendants to make whole Lagerstrom by providing him compensation for past and future pecuniary losses resulting form the unlawful employment practices described above, including but not limited to $1,000,000.00.

D.      Order Defendants to make whole Lagerstrom by providing him compensation for past and future pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and humiliation in the sum of $1,000,000.00

E.      Order the Defendant pay Lagerstrom punitive damages for its malicious and/or reckless conduct against his rights as described above in the amount of: $2,000,000.00

F.      Grant such further relief as the Court deems necessary and proper.

G.      Award Lagerstrom his costs in this action.


## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by the Complaint.

Dated: January 17, 2023

Asheville, NC

Respectfully submitted,

By: _____

Benjamin Lagerstrom, *Pro Se*
*Mailing Address:*
529 West 29th Street PHD
New York, NY 10001
(347) 237-8728
benjaminzzmultifarious@gmail.com

# Exhibit A

*EXHIBIT A, PHONE CALL A*

*Transcribed verbatim from https://youtu.be/m7_dTYJpqaw*

***Phone call between Petitioner and Defendant Agent Robert Melman re: Vaccinations, etc.***

1.
<u>Petitioner:</u> Hi Mr. Melman?

2.
<u>Robert Melman:</u> Yeah?

3.
<u>Petitioner:</u> It's Benjamin from Windsor Arms.

4.
<u>Melman:</u> Hi Benjamin how are you? My Name is--

5.
<u>Petitioner:</u> Good.

6.
<u>Melman:</u> Just so you know Mr. Melman is my father, he passed away, my name is Rob.

7.
<u>Petitioner:</u> Oh, okay.

8.
<u>Melman:</u>It's half a joke, just call me Rob please…

9.
<u>Petitioner:</u> Sure, sure, how are you doing Rob?

10.
<u>Melman:</u>Good, good, how are you doing?

11.
<u>Petitioner:</u> Getting there, getting there, I just um--

12.
<u>Melman:</u> I guess, um, no go ahead…

13.
<u>Petitioner:</u> Its just that I saw your call and I get all these calls for car insurance and stuff, and things I don't have…

14.
<u>Melman:</u> Yeah, they are so annoying. The Warranty on my car is expired for the last three years, yeah I get that call daily and I've also been selected by friends for a vacation, I get that all the time as well.

15.
<u>Petitioner</u>: I guess I have to pay off all these student loans to Harvard, right? Ha, ha..

16.
<u>Melman</u>: Um, probably, ha ha ha ha. Ben, everything good?

17.
<u>Petitioner</u>: Good, good... And thanks man, also for everything downtown I appreciate it.

18.
<u>Melman</u>: Well listen, things have been going really well and I see the career path you're on, it, you're in a good place. Um, and I guess you know the reason for my call.

19.
<u>Petitioner</u>: Yeah, I know this must be really hard for you guys too.

20.
<u>Melman</u>: Well, it's really difficult for a variety of reasons, number one um, you know my personal beliefs are irrelevant, um... well they are but they're not, so but it's also awkward because we're not allowed to um, uh, what's the word I'm looking for... to mandate that employees get vaccinated. Um, I can tell you personally my wife is registered nurse um, during the pandemic it was kind of rough, you know, she was, she running a covid unit um, and I spent about four months sleeping on the couch.. ha ha. You know we have two kids, my kids are in high school, and they're actually both, um, they're sixteen and eighteen years old, they're both athletes, they get tested on a regular basis, my older one started college so she actually won't be able to play unless she gets vaccinated. But, so and the last year for me was somewhat challenging because I was, I was sick. But I was pretty sick, not with Covid, with cancer actually.

21.
<u>Petitioner</u>: I'm very sorry to hear that.

22.
<u>Melman</u>: No, thanks, I appreciate that. Well, no um now, I'm in a good place they feel like they got it all, um and I actually never missed a day of work. But you know, um, I was scared to death number one of catching the virus, only because my immune system is compromised and I was also concerned about getting the vaccine because of the impact that it would have on any treatments I was receiving...

23.
<u>Petitioner</u>: That's really interesting because that's one of my concerns as well. I had an ordeal with cancer in 2009.

24.
<u>Melman</u>: Oh wow.

25.
<u>Petitioner</u>: And when I came, I was in The Dominican Republic and when I came back here uh, I had an issue with my blood count and I changed my diet and everything completely but, and it was really for the best, what I did was I went on a strict diet of steamed fish, steamed vegetables, you know for almost a year

26.

Melman: That's the best, that's the healthiest thing you can do.

27.
Petitioner: It's the best thing you can do it saved, it saved me, it was amazing, I was doing like three out of ten on my blood count and now I do a ten out of ten for a decade.

28.
Melman: That's great. That's great news.

29.
Petitioner: Yeah. I understand, yeah that's a lot to go through but diet is incredibly helpful.

30.
Melman: Yeah, um it's difficult because I'm a picky eater, you know I'm picky as hell I've never eaten fish in my life, um, ha ha, but um

31.
Petitioner: I spoke to, I spoke to Bassing, I spoke to Paula, they came down to talk to me about everything that was going on with the vaccines so, and I think they're both on the board, I'm not a hundred percent certain,

32.
Melman: I don't even know who Bassing is,

33.
Petitioner: Bassing and Susan, they're in 5B

34.
Melman: Oh yeah, I know who they are, they're not on the board.

35.
Petitioner: Ah, sometimes they do these things by proxy, um, but they came down and Paula came down too, to talk to me regarding the vaccines and they wanted everyone to be vaccinated and you know I'm not big on the whole vaccine idea mostly because I have an autoimmune disease in my family that is very rare, its called dermotomytosyitis, and I have to get looked at by a doctor before I can get that vaccine, and also I was sick as I just explained in 2009, that affected my immune system as well, you know I really don't put chemicals in my body you know that's not me but I told Bassing and I told Paula that--

36.
Melman: Look, before you tell me anything, I'm going to stop you for a second, number one you don't have to tell me any of this, this is a kind of off the record conversation so to speak, I don't want you to be feel that you're being pressured, nor do you have to, and I would suggest that you don't discuss it, well, its a small building, I would typically say that those residents have no business coming to you other than the fact that probably feel very comfortable with you in your position there and their interactions with you previous to this, so you know this because you don't owe anybody, not even me an explanation as to why you want to get vaccinated or not.

37.
Petitioner: I know.

38.

<u>Melman:</u> Just be aware, I don't want you to feel that you're being pressured.

39.
<u>Petitioner:</u> You know what it is though too? They live there, their families too, so I understand, this is really an extraordinary situation that we're dealing with these days so I understand and--

40.
<u>Melman:</u> Okay as long as you're keeping that perspective. Again, I want you to stay at 61 for as long as we can keep you until you get a super's job--

41.
<u>Petitioner:</u> Oh, I--

42.
<u>Melman:</u> No, no I'm serious and everybody is very please, I'm very pleased and so is the board, we're certainly pleased with the quality of your work. You should know that, and I'll tell you that up front, I don't have to tell you that but I'm telling you that because it's true. What was troubling to me up until we had this conversation was the fact that, um, in as much as we live and die with union rules and rules all over the place, there's also a lot of subjectivity for that, for lack of a better word into what we do, and people's perceptions mean everything when you're in a small building like yours.

43.
<u>Petitioner:</u> Oh yeah, well, the union stirs up a lot of trouble too that is really unnecessary,

44.
<u>Melman:</u> Yeah, um, well, for example if you called the union and said I got a call today from the managing agent and they were trying to coerce me into being vaccinated, I'd get a call and I wouldn't answer it and it certainly wouldn't be a huge deal, ha ha, and I'm not trying to coerce you but I do think that and where I'm going with this is that I would suggest to you and it's just a suggestion that you do speak to your doctors… if you want to, you know verify if it warrants that your auto-immunity in fact, but when it first became available I did the same thing with my doctors at Sloan, and they were like no by all means you're absolutely better off getting it um, but they certainly didn't mandate that I do it, nor did my company for that matter mandate that I do it. I got it because I thought it was the right thing to do but people have different political views on it also which is a whole other conversation--

45.
<u>Petitioner:</u> Sure. I told Bassing and um, Paula, I'm going to speak to other doctors and my idea is to um, take care of my family and stuff, and I have to just plan it out because that's kind of what consumes my days, is I have these two dogs and an elderly aunt that I take care of I said, that I have to take care of them but when I have some more free time in the coming weeks I'm going to go to my doctor and look into this further because the last time I spoke to a doctor about vaccinations, which is not during Covid times he told me that I can't get, what, I think it was during Ebola or something like that

46.
<u>Melman:</u> Right.

47.
<u>Petitioner:</u> And I got sick and we're talking about vaccinations and he's like you're really you can't get them but this is a different animal all together and I feel like you know I don't have an issue

doing that because you know these people live in the building and I work for them that's their life, that's where they live and looking into it is not a big deal, I'm happy to look into it.

48.
Melman: Well I'm even willing, because if you came back to me, and I wouldn't ask you for a note, if you came back to me and you said 'Rob my doctor really advised against it', I would have no issue at all, I don't think that would be the case based on you know the medical professionals that I've been speaking to, including my, uh my wife… ha ha.

49.
Petitioner: I'm sorry Rob, I couldn't hear you on the last part

50.
Melman: Oh Hi, can you hear me?

51.
Petitioner: I can hear you.

52.
Melman: If you came back to me and said my doctor's advised against it, at that point what I'd do is I would tell the board, only the board, that I had an off the record conversation with you and you've been advised not to get it, and it would kind of close the book on it and it would eliminate some of the negative I guess connotations that are associated with non-vacciners for you to do it this way.

53.
Petitioner: I have no problem doing that.

54.
Melman: Bear with me, Benjamin bear with me I'm sorry bear with me one second.

55.
Petitioner: Yeah.

56.
Melman: Good they hung up there quick. I'm even willing to give you the time off during the day, well, you're working there overnight.

57.
Petitioner: Yeah, yeah I work the overnights so I can just put things together. I'll definitely do that and I'll give you a call back I guess at some point next week, is that okay?

58.
Melman: Yeah as soon as you can just let me know and again I, I'm not trying to press you what I'm trying to, what I'm trying to avoid is the, the subjectivity that goes into these things, you know we can live and die with the union book but I think over there where you're so well liked, and I'm so impressed and Bianca is with the quality of your work I would just hate to see it come to this because, you know because of individual opinions, it should never be a function of your employment and its not and by no means is your job in jeopardy or anything like that but at some point the board has already asked if there's anything that can be done with a carrot or a stick and

there's nothing that can be done with a stick, there are things that can be done to incentivize individuals.

59.
Petitioner: I have no problem, uh, looking into this further.

60.
Melman: That's all I'm asking.

61.
Petitioner: Its also to my own benefit and to everyone's benefit so I have, I have no issue looking into this further.

62.
Melman: It is, you know especially if you're taking care of an elderly aunt I mean, you know I'd, personally that's something you should be considering as well, I don't need to tell you you're a smart man you know exactly where you are

63.
Petitioner: She actually has the same autoimmune disease, it runs in my family its called dermotomytosyitis, you can look it up its very rare, very very few people have and so she also cannot be vaccinated. Her doctor advised he that she can't be vaccinated so um that's the real thing about this vaccination with me, that's really what this is all about, about them, I'm just concerned that I might not be able to get it, so you know I like very healthy, I don't drink, I don't smoke I don't do drugs so I don't really worry about getting sick because I always make sure to take care of myself.

64.
Melman: Good and with that the last thing you want to do is take a vaccination that's going to compromise any of that.

65.
Petitioner: I know.

66.
Melman: Uh… That makes all the sense in the world.

67.
Petitioner: Uh, Rob you know these are like really extraordinary situations but I just want to let you know because you keep saying about the union, I, I've never spoken to the union about anything… at all. I've never called them.

68.
Melman: I'm not concerned about the union at all, in fact I sit on a committee with the union, and one of the things I'm doing with my own company is helping to put together a protocol for Covid. Its not that I'm concerned about the union at all, and if you did speak tot he union you'd have every right to you'd you know the, the I mean the crazy part is my wife who's in the union, you know the nurse's union as a front-line worker, she's never been mandated to even be tested, which I think is insane. I guess the reason for that is because they don't want to know.

69.

Petitioner: My girlfriend, my girlfriend actually gives the vaccine that's what she does and she not received one herself and they don't mandate that the people giving it receive it.

70.
Melman: Right, right you know its, its...

71.
Petitioner: Crazy times.

72.
Melman: It is. They are crazy times its unprecedented, uh but my point is that I'm not concerned about the union at all nor will you ever be disciplined for you know not getting a vaccine or for talking to the union, I mean that's what you pay your union dues for and I'm a big supporter of that. I'm not concerned about the union, I'm really more concerned about, you know the bottom line is I'm concerned about your, the way that you're being perceived in the building, the objectivity, you know the subjectivity that goes along with it--

73.
Petitioner: Oh yeah…

74.
Melman: But it sounds like you're doing the right thing. If you were my brother in law I'd be giving you some more advice…

75.
Petitioner: Hey, yeah… I don't feel any pressure from any body in the building but just so you know if there ever were an issue regarding my employment or anything like that, you know health insurance, or a union matter I'd always call you first and talk directly with you first

76.
Melman: Good idea, that's a good idea.

77.
Petitioner: There's no reason for that.

78.
Melman: I would also tell you, from your own career path perspective, once things settle down a bit, jump on some of those courses that the union is offering, I'm on the curriculum committee and some of those courses would be very good for your career path.

79.
Petitioner: Years ago I took some of those courses, I took the boiler course, um lets see, I started with I took the electrical, yeah standpipe-sprinkler years ago.

80.
Melman: Oh, good.

81.
Petitioner: It's, it's a good business, I never thought that I'd be in this business as long as I'm in it, but you know it was really very good so far so

82.

Melman: You know, I'll tell you my, my wife's cousin actually was working for the same company for about twenty years, she was also working for the same company, they have a disabled child and his boss came in one day, it's a small company, and said 'I just sold the business', you guys have 90 days, I'm going to cover your insurance for 90 days um, and again, this guy was in his 50s, you know he didn't have a great job but it was paying his bills, and he found himself with nothing. I gave him a doorman's job and he's making money than her ever made, his benefits are great… [inaudible]… and he's got the job security--

83.

Petitioner: Oh yeah.

84.

Melman: So it's definitely, its, there is something to be said for that union. It actually better than my wife's, who again is a healthcare professional, its a, its a good gig and people don't, years ago there was a stigma about doormen but, but today its a very good job you know--

85.

Petitioner: Hey, any job that puts the food in the 'fridge and pays the bills is good, you know.

86.

Melman: No no no. It's more than that because the union, you, you…[inaudible] pays the bills but I'm talking about long term in your career that you'd be a great resident manager unfortunately sometimes you have to go back a little to get there, you know I could get you a job you know in a smaller building or something like that… [inaudible] … you'd fit in because you understand the communication and you've been able to demonstrate that to me, I'd absolutely think that you, you're a candidate for a manager's job somewhere here… [inaudible] …

87.

Petitioner: Thank you, thank you very much I really appreciate that. You know you guys are awesome, you know and uh, thank you for the phone call and I'll go and get looked at and talk to my doctor

88.

Melman: You know don't send me an email, you can always call me, call me 24-7,

89.

Petitioner: Ah, so you know I'll let you know more toward the end of next week if that's okay, 'cause that's just the time frame--

90.

Melman: Yeah, whenever you find out

91.

Petitioner: Yeah, thanks so much for reaching out.

92.

Melman: [inaudible]

93.

Petitioner: God Bless man, have a good one.

94.
<u>Melman:</u> [inaudible]

*EXHIBIT A, PHONE CALL B*

*Transcribed verbatim from https://youtu.be/bD8JDfqgy3w*

***Phone call between Petitioner and Defendant Agent Bianca Taveras re: Vaccinations, etc.***

1.
<u>Taveras:</u> Okay Benjamin, how are you?

2.
<u>Petitioner:</u> Oh hey Bianca, how are you? I had a handful of my dogs for a moment, getting them back in… I've got these two puppies they're 14 months old and they're a handful sometimes. Doing good?

3.
<u>Taveras:</u> I'm doing good, how are you? How'd you do in the storm?

4.
<u>Petitioner:</u> Um, not too bad, I got, I got home and I just kind of slept through it.

5.
<u>Taveras:</u> Nice, are you like, are you in the state of New York, what state are you in? Like what area are you in?

6.
<u>Petitioner:</u> Oh yes, I live on 92nd Street,

7.
<u>Taveras:</u> Oh, so uptown, I know the Bronx was hit really hard.

8.
<u>Petitioner:</u> Actually, what happened was I had asked about it when I came home and people were telling me, yeah we didn't get it too bad up here and I don't recall it being that bad actually

9.
<u>Taveras:</u> [Laughing]

10.
<u>Petitioner:</u> But I heard downtown it was kind of tough.

11.
<u>Taveras:</u> Yeah it was scattered, I know Queens, some parts of Brooklyn and the Bronx I hear those were the worst of it but yeah, I'm reading the headlines now and the death toll is going up and up.

12.
<u>Petitioner:</u> As I was coming home yesterday from work cause I'd worked yesterday until two o'clock, the sky went from being sun to like, it was like the middle of the night by the time I got to the train.

13.
<u>Taveras:</u> Yeah, I saw that happen too, yeah you're right, like doomsday.

14.
<u>Petitioner:</u> Everything, there was a flood down there as well.


15.
<u>Taveras:</u> We had a little issue at the building last night, yeah some water backing up, a little minor flooding condition in the basement but we were able to get it under control, and thankfully no damages.

16.
<u>Petitioner:</u> What's going on?

17.
<u>Taveras:</u> Danny was stuck there so I just wanted to touch base with you I know you're coming in, are you able to make it in for your shift at ten?

18.
<u>Petitioner:</u> Of course, I'll be there.

19.
<u>Taveras:</u> Okay, good. So that was first and foremost and then I wanted to talk to you because we haven't had a chance to speak and it's more so about your vaccination status, I think you spoke with Rob recently about it.

20.
<u>Petitioner:</u> Sure.

21.
<u>Taveras:</u> And you know the board is just very keen um, on making sure that the staff is vaccinated or pushing for the staff to be vaccinated, they very much so want staff to be vaccinated. So um, I know from Rob you were checking with your doctor and there was just some clearance--

22.
<u>Petitioner:</u> Yeah well, the thing is that I do have Dermotomytosytis which is an autoimmune disease and uh, there's a lot of questions about whether or not people who have that can get any vaccinations, I'm not sure how much Mr. Melman had related to you

23.
<u>Taveras:</u> All I know is, all I know is you were speaking to your doctor about whether or not you should get it.

24.
<u>Petitioner:</u> So, um, it's kind of twofold, its been really hard to get doctors to put together letters and stuff in that regard and the thing is, its also such a rare thing, I don't know if you've looked into it I mean at one point my other had it and our doctor had said years ago that she was probably the only person he ever knew in New York, you know, that he ever knew who had it, and my doctor who retired had told me years ago that I was the only patient he ever had that had that and he found it to be kind of interesting, so its hard to get doctors to put letters together but just as far a getting procedures done, like I have something I have to remove and its been a little difficult seeing and scheduling things with doctors over the last couple of months--

25.
Taveras: Are you saying that you shouldn't get the vaccine?

26.
Petitioner: Well, the thing is that the vaccine could actually kill me. Eh, cause people who have dermotomytositis, its an autoimmune disease, so vaccinations are very dangerous. I've only ha done vaccination my whole life when I was a child, um, I had a vaccination  I think it was for chicken pox and I still wound up getting it actually so, um, the vaccinations are kind of dangerous and for me to be able to get a doctor who knows what he's doing and check it out and um, make a qualified opinion about that so um, I--

27.
Taveras: Right, no I agree.

28.
Petitioner: And you know, um, some of the residents, I understand Bianca and you know, because yes… they live there, you know, and they're all very nice people, and I know that people are really concerned about this and I, and I understand that um, but I've had some residents say you know, done more than inquire as to my vaccination status, they've actually urged me repeatedly to go seek medical examinations and stuff like that so you know, I just kind of let that go well, I understand that people are emotional over this--

29.
Taveras: Yeah, well--

30.
Petitioner: But you know I really need to have someone who's qualified uh, look at that, I had a covid test the other day because I needed it to go into a government building and--

31.
Taveras: Right.

32.
Petitioner: I had explained to them the dermotomytositis situation uh, and they were like 'we're totally unqualified to even begin to handle that.' That's what they had told me so--

33.
Taveras: So, and I apologize if the residents are prying and somewhat harassing you guys in general, I know we made a point to discuss that with the board who did bring it up at the annual meeting of shareholders and did let residents know they should not be inquiring as to your vaccination status or ask personal health questions like that so I apologize if that's happened, I do want to be able to tell, report to the board that you and I spoke and be able to say to maybe put a time frame on it, like, I don't think I'm hearing that you're opposed to the vaccine, I don't know if its safe for you, are you opposed to getting it?

34.
Petitioner: Well, I, I am opposed but this is where I draw the line. If I'm told that its fully safe and I can be reassured of the safety of it okay, you know I, I don't have an issue getting it, but I just need to I need to, I need to be told by a doctor hey you know--

35.
Taveras: Right.

36.
Petitioner: You get this shot its not going to be a repeat of when you were younger, its not going to be a repeat of what happened to your mother when she was younger, because you know my mother was paralyzed for a year because she received a vaccination, hold—hi baby how you doing? [Dog jumped in lap of party speaking]--you can look it up, dermotomytosytis its a very unique sort of thing, you know and I'm, I'm pretty open about it because I don't want you to think that I'm opposed to it or anything like that, its just something that I have to deal with on a regular basis, you know, and I figured it would be best to just be upfront with you guys about this--

37.
Taveras: And I appreciate that. I wouldn't, you know obviously this is confidential I won't, you know, divulge what you've told me unless, you know, you consent to it but,

38.
Petitioner: I mean well--

39.
Taveras: Do you have a doctor that you can talk to because I mean even if that's the case we can present that to the board and say look, this is from his doctor, you know this is the doctor's opinion, it's not Ben, you know against or opposing this, you know they are putting more pressure on us and you know things are gonna, people are gonna start feeling more pressure from the union from everywhere and they do want us, you know if you're not vaccinated we would have to implement testing and [inaudible] the vaccination.

40.
Petitioner: Yeah, well—I, let me um, hey I'm sorry are you asking if I have a doctor?

41.
Taveras: If you were able, yeah do you have like an appointment set up, someone to see or are you still researching a doctor--

42.
Petitioner: No, actually so this is what had occurred I had um, spoken with doctors and they were, the doctors I had spoken to are uncomfortable in issuing a letter saying its totally safe for me with, you know having dermotomytosytis and I did receive a covid test a few days ago and it was discussed there at the City MD about dermotomytosytis and they were like yeah we won't even touch that so no, I have to go speak to, you see what happened is I had a doctor, Joseph Klager for a lot of years, he retired about five or six years ago, so I don't have a primary care since so I just need to find someone who you know, is comfortable in putting his name on the line for something like that and I'll continue to do it I guess I just kind of put it to the side figuring it wasn't that big an issue after all, I just felt like everyone was really concerned at one point, you know I work the night shift Bianca, ha, I don't really watch the news and stuff--

43.
Taveras: Yeah.

44.

Petitioner: You know I don't have a lot of contact with people and I know that everyone got really concerned and then I spoke to Mr. Melman and I hadn't heard back from him and no one really brought it up, and I kept looking into it because obviously it concerns me you know, for travel and to be able to go take a trip and just things you know, like to that extent, but it um, it got on the back-burner a little bit, I'll be happy to start calling around doctors and stuff this week if you'd like.

45.
Taveras: Yeah, I mean, I'd just like to get to, report to the board, and I don't want to, my intent is not to pressure you, push you, I would never want to force someone to do something, it's completely your decision at the end of the day, I just want to be able to report to the board accurately on what they can expect and if that's the case I can just say you're getting an opinion from your doctor.

46.
Petitioner: You could also tell them I sought opinions as well and it's just difficult in that regard. I consent to you telling the that. I understand that this is a very, very unique--

47.
Taveras: Yeah, yeah.

48.
Petitioner: A very unique situation and it's very stressful for people, I'm sure it's stressful for you--

49.
Taveras: It is, it's an awkward conversation to have you know, you just have to put your own personal opinions to the side and do what you're asked type of thing but um, the board really wants the staff to be fully vaccinated an will do what they can in their power to insure that legally, like to you know legally make that happen, obviously um, so I think in the meantime, until you are able to get safely vaccinated which I totally understand, I encourage you to make sure its safe--

50.
Petitioner: Yeah

51.
Taveras: We should probably implement um, testing.

52.
Petitioner: Okay.

53.
Taveras: We can do it each week, like if you do it, if you get us the results on the day of your first shift of the  week.

54.
Petitioner: Okay. Um, just the question is if there's a charge for testing I'm not, I don't think there is actually I don't think I got charged for the test I had a few days ago, if there is a charge can, you know even if there's like a co-payment of $50 or $40 a week can I send that invoice to you guys?

55.
Taveras: We can, what I can do is I can work with you to find a free covid testing site near the building.

56.
Petitioner: Okay.

57.
Taveras: Or near your home. There are several and we can, you know work together on that.

58.
Petitioner: Okay, so you guys want testing done, is it like a 72-hour period before each work week? Is that how you want it done.

59.
Taveras: Uh, as long as it's no more than yes 72, or two, 48 to 72 hours before your first shift the first day of the week... [Inaudible]...

60.
Petitioner: So I start on Wednesdays, I guess Mondays would be the best day to get a test then...

61.
Taveras: Right, or even Wednesdays before your shift. You know they have some of the rapid test results available I've heard. You can get them on the same day.

62.
Petitioner: Is that, are they allowed to do that to ask me to get tested? Once a week, I mean is that, I just feel like it's kind of dangerous to go into a place where people are regularly sick with this going around to be tested, I don't really know, I don't really know how that... kind of sits... I mean um, you know...

63.
Taveras: Yes, well we've had I know that the R.A.B., the Real Estate Advisory Board and the union have had many you know, discussions and formed a committee on this and the memo we got from the union was that they are encouraging vaccinations and that the buildings are able to require routine testing for employees that are not vaccinated.

64.
Petitioner: Okay. So um, if you want me to get tested every week if that's what I'll go and do it, is that what you want?

65.
Taveras: I think that's what the board wants.

66.
Petitioner: Alright. No problem, I'll, I'll do that and so, yeah I'll do that. Let me find out first if the City MD here charges or not, because they didn't charge me when I was in there the other day, I don't know if I'll get a bill for that so--

67.
Taveras: Yeah--

68.
Petitioner: That would be most convenient because its right here and Monday is my day off so if they don't charge is it okay I get tested over there?

69.
Taveras: Sure.

70.
Petitioner: Okay.

71.
Taveras: Yeah I don't have an [inaudible] for that and we can start for next week--

72.
Petitioner: Okay, so I'll go over there Monday and look, even if they do charge I'll just get the test done anyway--

73.
Taveras: Well, I don't want you to have an expense for this so if they charge let me know and I could find a site close to the--

74.
Petitioner: Yeah--

75.
Taveras: I'll work with you on that.

76.
Petitioner: But if they do it's one time, you know it's not 'gonna break the bank. [Laughs] Huh, no problem!

77.
Taveras: [Laughs] Your choice, no I understand.

78.
Petitioner: I know you don't really like to be in the middle of this stuff, I understand that you're just doing your job here so I understand.

79.
Taveras: Thank you, I appreciate it.

80.
Petitioner: I know its a touchy situation and I know you got to do your job. I understand, Bianca. Um, I'll go get the test but no, let's cross that bridge when we get there I mean if a doctor tells me that no way you can get any of these vaccinations or its very dangerous for you to do that its life threatening--

81.
Taveras: With that documentation its like a valid medical exemption.

82.
Petitioner: I guess the tests would have to continue indefinitely then, correct?

83.
Taveras: I would think so, we'd discuss it with the board um, but I would imagine so. Alright. A lot of my buildings have already implemented, regardless, so I imagine that would be the case here too.

84.
<u>Petitioner:</u> I have no problem starting up the covid testing if that's the case, so I'll go start that and I'll try to get something from the doctors and we'll revisit it at that point.


85.
<u>Taveras:</u> I appreciate your understanding, thank you Ben.

86.
<u>Petitioner:</u> No problem, talk to you later.

87.
<u>Taveras:</u> Take care.

88.
<u>Petitioner:</u> Have a nice night.

89.
<u>Taveras:</u> Bye.

# Exhibit B



# ORSID
------- NEW YORK -------

**<u>VIA EMAIL & RETURN RECIEPT MAIL</u>**
December 20, 2021

Benjamin Lagerstrom
201 West 92nd Street, Apt. 6B
New York, NY 10025

RE:   Termination of Employment
        61 West 9 Tenants Corp.

Dear Benjamin,

This letter shall memorialize your termination of employment from 61 West 9 Tenants Corp.as of December 17th of this year. As noticed to you in writing on December 17th, your employment is terminated due to your misconduct including insubordination over the last couple of months, and disrespectful email sent to your supervisors on December 15th.

You have refused to engage in a respectful dialogue and to cooperate with management's process with regard to your employer's vaccination mandate and have disregarded the guidelines given to you.

As mentioned, you are not to return to the building for any reason except to collect any personal property you may have in the building, which is to be arranged in advance with management. Additonally, we will need to retrieve your building key and fob at this meeting.

Your final check will be issued on the next regular pay day, Thursday, December 23rd. Payment for your accrued vacation time will be included in your final paycheck. You may pick up this paycheck at the arranged meeting to collect your personal property from the building.

Regards,

Bianca Taveras
Account Executive

Cc:   SEIU Local 32BJ
        Realty Advisory Board on Labor Relations Inc.
        The Board of Directors

Phone: (212) 247-2603, (212) 484-3742
Fax: (212) 586-4524
www.orsidny.com

Orsid Realty Corp
156 West 56th Street, 6th Floor
New York, NY 10019



ORSID
NEW YORK

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7021 0950 0002 2199 7649

NEW YORK NY 100
22 DEC 2021 PM 9 L



5:14

Fwd: An Incident Report has
been Submitted for Approval
in The Windsor Arms - Abuse

Inbox

**Bianca Taveras** 11/3/2021
to me, Rob, Super61

Benjamin,

I am sorry that this happened. I want to thank you
for your professionalism in handling what I am sure
was a very uncomfortable situation. You
maintained your composure and exercised good
judgement throughout what I understand was
almost a two hour ordeal. Such level of service is
greatly appreciated and well noted.

Thank you,
Sincerely,
Bianca

--------- Forwarded message ---------
From: **Benjamin Lagerstrom**
<notify@buildinglink.com>
Date: Sun, Oct 31, 2021 at 1:30 AM
Subject: An Incident Report has been Submitted for
Approval in The Windsor Arms - Abuse
To: btaveras@orsidny.com
<btaveras@orsidny.com>

An Incident Report has been Submitted for Approval
in The Windsor Arms.

5:15                                    58%

An Incident Report has been Submitted for Approval in The Windsor Arms.

**Incident Date**: 11-Oct-2021
**Incident Type**: Abuse
**Incident Location**: front of building

**Incident Entered by**: Benjamin Lagerstrom
**Submitted for Approval by**: Benjamin Lagerstrom

**Description of Incident**: B/M on bicycle approx. 6', 30 yrs., dressed in all black with beige boots, white watch, on a CitiBike arrived outside the building with a bag on the bike that looked like a delivery. I asked him if I could assist him and he did not respond. He left the premises. He returned again but again left. I then noticed he was on his phone at the service entrance and I went to inform him that he could deliver his package to the front but he again rode off headed toward 5th Avenue. At approx. 10:10 p.m. he returned to the front of the building and sat with his hands folded. He still had the package. I exited the building and asked him "Do you have a package for the building?" and offered assistance. He became animated and yelled at me "Do I look like I have a package for the building, do I look like a delivery guy to you?" Then he made statements that he earns hundreds of thousands of dollars a year and asked me if it is true I make $40,000 a year and accused me of racial profiling and being a white supremecist and a racist and said he was going to STAND THERE ALL NIGHT LONG,

 

that I was "directing comments at him", that he would call my boss, have me fired, make reports, and that I need to shut up and "get your ass inside and do your job". I called 911. The encounter up to this point between us lasted approximately six minutes. I understood he was baiting me. When I called 911 he moved his bike more toward the curb and continued making accusations. Although I called 911 and was waiting for them to arrive I saw a police car and flagged it down. I told them what had transpired and that I wanted him removed from the front of the building because he had been threatening me and that he threatened to stand outside the building all night long. At this point the man began to tell the police that I was a racist and a white supremecist and that I was harassing him and he felt threatened by me. The police told him if this was the case to move on but he refused and stated this is a public street and he would stand there all night because "he wants to make a point as a black man". He began to yell and point at the police and curse at them probably a dozen times, demanding a supervisor. He said he would only leave if I would give him my name so he could file a report. I refused to give my information to him but freely did give it to the police privately. I informed my supervisor, Andrew Ortiz, who came directly from the location he was at to oversee the situation and immediately ordered I do not engage with the man, that this appeared to be a setup. The man requested the police get him a supervisor so he could make a report and "get his (my) name" and a supervisor arrived. The police were visibly frustrated by this person's tactics and when the supervisor arrived he reviewed

5:15      58%

the video of the man engaging with me and determined he was harassing me stating to the man "I watched the video--you (the man) were yelling at him with your hands in the air" and took a report as such from me (on file at 6th Pct. by Monday). The man cursed at the police and stated the supervisor that the supervisor did not like him because he is "an intelligent black man." The entire time he pointed and yelled to me that I was a racist and a white supremeicist causing multiple residents to inquire as to what was happening. Although he was slandering me I did not engage in conversation with him or respond. THE MAN ARGUED WITH THE POLICE FOR OVER 90 MINUTES YELLING AT THEM AND CURSING AT THEM. The situation was incredibly uncomfortable, having to unload residents luggage and perform regular operations while the police surrounded this man and he slandered me. The police theorized he is a professional litigant and informed me that he was asking to be arrested. I agree. They also repeatedly said they see this "every day" and felt that the act was directed at the police to force a false arrest. I really felt as if the man's actions constituted an arrest and charges. The police stated they could not arrest this man and allowed him to stay outside the building while they left and informed that "if he leaves and comes back" that they could then arrest him for harassment. About ten minutes after they left he left as well. END REPORT.

--

----

BIANCA TAVERAS
ACCOUNT EXECUTIVE ▮T: 212-484-3742 | F: 212-

# Exhibit C

5:18    58%

# For Rob and Bianca -- Better copy of cease and desist easier to review  Add label

**DOUBLE DOUBLE** 11/8/2021
to Robert, Bianca, bcc: rhantman ⌄

| From | DOUBLE DOUBLE · bb3553793@gmail.com |
|------|-------------------------------------|
| To | Robert Mellman · rmellman@orsidny.com |
|  | Bianca Taveras · btaveras@orsidny.com |
| Bcc | rhantman@hantmanlaw.com |
| Date | Nov 8, 2021, 7:42 AM |
|  | View security details |

I have sent this exact same copy of the c&d from last night, it is much better quality, thank you for your review.

-B

Copy of text from last night's email, c&d attached.

*****

Dear Bianca and Rob,

I regret that I have to formally ask you and the board at Windsor to immediately cease and desist from any further inquiries regarding my medical status or religious beliefs. (See attached.)

Contrary to the ideas of the building board, the 32BJ-RAB memorandum is unenforceable because it is illegal. It also sharply contrasts the law as pertains to Covid.

After issuing your office good faith, courteous explanations why I have not been vaccinated in replies to requests Orsid agents have deemed "harassment" on multiple occasions, I have come to the conclusion that the board does not care one iota about my health or well being if they would impute such a level of onerous (and unlawful) pressure against my civil liberties.

This has to stop right now. While I cannot hold you accountable for board members who may or may not decline this third cease and desist in this regard, failure to adhere to my rightful asking that no further discussion be had regarding this matter will force me to seek injunctive and other relief from The Federal Court for the reasons detailed in the cease and desist, and any such action will include the exhibition of the promises made me by Orsid to provide reasonable accommodations to the exemption rights invoked.

I am sending this email on an emergency basis because the most recent communication from Orsid and Windsor has threatened my job. The chain of command between the two organizations requires your office check and complete the acknowledgement of understanding at the bottom of the cease and desist and send it back to me promptly.

Because of the dire circumstances surrounding this heinous attempt to force me into agreeing to do something I have a right by law not to, I have sent

5:18                                    58%

requires your office check and complete the acknowledgement of understanding at the bottom of the cease and desist and send it back to me promptly.

Because of the dire circumstances surrounding this heinous attempt to force me into agreeing to do something I have a right by law not to, I have sent the first scanned copy of the cease and desist. I will send the same exact cease and desist tomorrow from a better scanner but I wanted to insure you got this before an unfortunate adverse action can be taken against me.

Thank you for your careful legal review and attention to this matter. I am upset that something so absurd as a wholly illegal memorandum from a third party could put this stigma on a working relationship I have truly enjoyed otherwise with your office. Hopefully we can move on from this in a positive way.

Warmest Regards,

Benjamin



PDF  Cease and...r, et al..pdf

↩ Reply          ↞ Reply all          → Forward



**October 25th 2021**

**Re: FOR RELIGIOUS EXEMPTION / ACCOMMODATION RELATED TO COVID-19 VACCINATION**

On behalf of Benjamin Lagerstrom and in compliance with religious liberty protections in federal law Executive Order No. 13798 § 4, 82 Fed. Reg. 21675 and Religious Freedom Restoration Act of 1993 and Title VII of the Civil Rights Act of 1964, this recognized church letter respectfully serves as an official exemption/reasonable accommodation request for said individual seeking exemptions from federal and state laws that burden their religious beliefs on the grounds of their sincerely held religious beliefs, tenets of faith, objections and practices which prohibit them from receiving a COVID-19 vaccine.

Thanking you for your assistance in this matter.



**Ordained Minister**

**Amanda Nix**

**Universal Life Church Ministries**

**2880 Zanker Road, Suite 203**

**San Jose, CA 95134**





To whom it may concern:

No employer or acting authority is to request or demand to know church member information.

Our church member information is private and protected by law.

Requests and demands to divulge or prove church member information, counseling, standings, etc is against the Civil Rights Act of 1964 and the 1931 Minnesota Supreme Court ruling that provides justification for the clergy penitent privilege, upheld in all 50 states today.

Requesting a letter of exemption meets more than a reasonable request and is a burden to the one submitting it and the Church according to the word of God and U.S. religious discrimination laws.

The position of those who have placed these dishonorable and unconstitutional demands is to take the word of those who adhere to their religious beliefs by duty and tenet and move on.

No person should have to prove or place their religious sacred belief and worship on display to anyone especially in the workplace or secular environment where the separation of church and state exists. This is shaming, exposing and harassing to the one who values their religious beliefs. It is also a sin before God. (Matthew 18:6)

Employers are not experts in religion, or the affairs of the Church but I would highly recommend that they brush up on religious laws and rights that are afforded and protected by those in such a position.


Somberly,


Ordained Minister
Amanda Nix
Universal Life Church Ministries
2880 Zanker Road, Suite 203
San Jose, CA 95134

**1**

BENJAMIN LAGERSTROM
201 WEST 92 STREET, #6B
NEW YORK, NY 10025
(347) 455-4356, bb3553793@gmail.com

Letter for review by intended parties only, *confidential communication.* Not for redistribution.

Intended Parties:

National Labor Relations Board
Washington, D.C.
Phone: (202) 208-3000
Fax: (202) 208-3013

Building Service Employees Union 32BJ
Law Department
New York, N.Y.
Phone: (212) 388-3800
Fax: (212) 388-3848

Realty Advisory Board on Labor Relations
New York, N.Y.
Law Department
Phone: (212) 889-4100
Fax: (212) 889-4105

Orsid Realty
Bianca Taveras, *as agent*
Rob Melman, *as agent*
(Corporate Counsel Included)
(Windsor Arms Building Board Included)
New York, N.Y.
Phone: (212) 484-3742
Fax: (212) 586-4524

To: Bianca Taveras, Rob Melman, *Orsid/Windsor*:

　　　　Re: Unlawful Attempt to Suppress Religious and Medical Exemptions and Accommodations from Building Service Workers Union 32BJ and The Realty Advisory Board forcing Orsid Realty and The Windsor Arms as Unwitting Third Parties; Cease and Desist Demand, etc.

Dear Rob and Bianca,

　　　　This letter is not, and is not intended to be, a complete accounting of the events described or a final position on the subject matter thereof by myself, nor does it serve to waive any rights under law or benefits thereby due me via my employment; This letter does serve as an attachment to my formal complaint with *The National Labor Relations Board* ("NLRB") concerning the wholly unconstitutional Memorandum of Agreement ("Memorandum") dated September 30, 2021 between *SEIU Local 32BJ* ("32BJ") and *The Realty Advisory Board on Labor Relations* ("RAB").

**2**

As you know 32BJ and the RAB have issued the memorandum with the implicit intention of circumventing civil liberties and Federal Law to allow private employers to require employees be vaccinated against Covid-19 as a condition of employment; interestingly enough the memorandum on its surface shows a clear dishonest state of mind between 32BJ and the RAB to create wholly illegal layers of liability deferment between the union, its members, the RAB and its members, the building boards and building management companies and agents, and employees. At bottom, the NLRB, via The National Labor Relations Act (NLRA) is the authority of any alteration to 32BJ's collective bargaining agreements and plainly the memorandum and all of its caveats are wholly unlawful per the foregoing, and for this reason I decline to sign or provide information requested in the forms issued me regarding privileged personal data regarded as private by law or otherwise parcel to that data. (1)

**The memorandum and its provisos are unenforceable via The Administrative Procedure Act ("APA") and The United States and New York Constitutions, the employee is not required to complete or respond to the forms issued to him.**

The NLRB is tasked with the duty of insuring all bargaining agreements of unions are within the confines of Constitutional law. Agreements that fall outside of this scope are unenforceable and theretofore illegal:

> "Decisions of the National Labor Relations Board (NLRB), like those of other administrative agencies, are subject to review by the federal judiciary. Standards of review have evolved over time. The Administrative Procedure Act of 1946 provides that administrative decisions must be in accord with law and required procedure, not arbitrary or capricious, not contrary to constitutional rights, within an agency's statutory jurisdiction, and supported by substantial evidence..." *St. Antoine, Theodore J. "The NLRB, the Courts, the Administrative Procedures Act, and Chevron: Now and Then." Emory L. J. 64, Special Issue (2015): 1529-52.*

Although the statutory jurisdiction of the NLRB does not supersede any constitutional right, neither does any Federal agency or court's authority. The supremacy clause (United States Constitution's Article VI) states that *all laws* made furthering the Constitution and all treaties made under the authority of the United States are the "supreme law of the land." The Supreme Court has interpreted the clause to mean that the states may not interfere with the functioning of the federal government and that federal law prevails over an inconsistent state law, and the APA governs that all Federal Agencies must follow APA guidelines when taking action that effects private parties, including the Centers for Disease Control ("CDC").

> The APA defines agencies as "each authority of the Government of The United States, *whether or not* it is within or subject to review by another agency." *(Emphasis added.) See 5 U.S.C. § 551(1).*

Beyond even a scintilla of contention, 32BJ is under the jurisdictional oversight and decisions of the NLRB and the APA Federal Law. 32BJ has been a constant and residual defendant party to NLRB litigation for many years. Their avoidance of complying with civil liberties in this matter is abhorrent. The right to unionize is a Federal Right, and the right of private sector

---

(1)32BJ is obligated to negotiate contracts and working conditions on the behalf of it's member employees to their highest benefit, and are chartered to strengthen protections in the workplace against discharge. Deprivations of this type that jeopardize employment of members is purposefully illegal.

3

unionized employees to decline vaccinations for religious or medical purposes is protected by precedent.(2)

The APA, the Federal Law governing the NLRB and guiding its administrative decisions (including an expected decision in the Senate to nullify and void the memorandum discussed here) is fully in statutory effect, as the NLRA would have had to be an act in law approved by congress that nullifies portions of the U.S. Constitution to make the memorandum enforceable, which we all know is not so.

The memorandum provisos requiring employees submit to extensive examinations of their religious beliefs and medical conditions to "prove" they exist, when they were never a prior condition of employment, never effected their ability to do their job, or are even inquiries allowed by civil liberties, is shockingly unlawful.

It is clearly established that forms requesting employees provide this sensitive data are unlawful unless they provide an option to *decline* answering to these inquiries. Concurrently, the NLRB in their own published forms that inquire of Covid-19 vaccination status, etc., offer a printed option box for form users to decline answering those inquiries. Indeed, when juxtaposed to the Constitutional privileges offered all persons employed or otherwise (as is the case) by the Federal Government, alongside the bane attempt by 32BJ and the RAB to ignore this legal necessity, the actions of the union and real estate board amount to true constitutional deprivations via reductions of rights when Article VI upholds all policies and rules of agencies in this way must further and enhance Constitutional Rights.

The requests made in the medical exemption inquiry letters guided in their content by the memorandum are not only extraordinary and outside the scope of our liberties, they are fully opposite of the guidelines followed by The Equal Employment Opportunities Commission ("EEOC") in determining an acceptable standard for employers to require medical examinations. The EEOC in the rule publication titled *Pandemic Preparedness in the Workplace and the Americans with Disabilities Act*, revised March 19, 2020, spells out the specific rules making the inquiries sought in the aforementioned forms in violation of *The Americans With Disabilities Act* ("ADA"), *Rehabilitation Act, 29 CFR § 1630, Regulations to Implement the Equal Employment Provisions of The Americans With Disabilities Act*, during the Covid-19 pandemic (3):

> "The new information added to this EEOC technical assistance document in 2020 about Covid-19 focuses on implementing these strategies in a manner that is consistent with the ADA and with current CDC and state/local guidance for keeping workplaces safe during the Covid-19 pandemic..." at I(B)Pp.4 "The ADA prohibits an employer from making disability-related inquiries and requiring medical examinations of employees, except under limited circumstances, as set forth below." at II(A)Pp.1

The guidelines for pandemic-related discharge from work and the established reasonable legal standard of inquiry by employers as relates to medical conditions and the "direct threat" standard of acknowledged pandemics within the scope of the ADA imputes that any type of

---

(2) *See Harvest Rock Church v. Newsom, 2:20-cv-06414, 141 S. Ct. 1289 (2021), et. sq. 889 (2020)* [permanent injunction granted and an award of attorney's fees of $1,350,00.00], Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341 (7th Cir. 2020), Maryville Baptist Church v. Beshear, 957 F.3d 610 (6th Cir. 2020), *Dr. A et al. v. Hochul et al.*, No. 1:21-cv-1009 (DNH/ML).

(3) These ADA standards apply to federal sector complaints of non-affirmative action employment discrimination arising under section 501 of the Rehabilitation Act of 1973. 29 U.S.C. § 791(g) (1994). It also applies to complaints of non-affirmative action employment discrimination arising under section 503 and employment discrimination under section 504 of the Rehabilitation Act. 29 U.S.C. §§ 793(d), 794(d) (1994). at Endnotes(10).

4

discharge from work is only within the confines of the ADA if issued by Federal public health authorities:

> "If you or a member of your household fall into one of the categories identified by the CDC as being at high risk for serious complications from the pandemic influenza virus, you would be advised by public health authorities not to come to work..." *at III(A)(2) ADA-Compliant Pre-Pandemic Employee Survey.*

The survey example, entered into the technical assistance document prescribes the only informational data employers can collect from persons determined or undetermined to be within the direct threat category as simply an answer of YES or NO as to whether the employee's illness or possible illness, for which the employee is seeking reasonable workplace accommodations as per law, would prevent them from coming into work should the Federal government issue a no-work order that pertains to their medical category and job-type.

Although styled *"ADA-Compliant Pre-Pandemic Employee Survey"* an ejusdem generis reading of the *Pandemic Preparedness in the Workplace and the Americans with Disabilities Act* rules shows plainly they apply even after an influenza pandemic (Covid-19 is defined by the CDC as this) is announced, has not been modified since March of 2020, and applies only to the concession that a pat-one yes or no answer concerning an employee's medical status preventing them from being "available" for work is the only ADA-compliant inquiry an employer can make of an employee in this regard if the employee declines to respond to, or respond further to, inquires about disabilities or for medical examinations:

> "The following Questions and Answers are designed to help employers plan how to manage their workforce in an ADA-compliant manner before *and during* a pandemic." *At III, Pp.1*

The EEOC document makes concessions to the ADA that limit the employer to the basic yes or no question *as relates to preparation for the onset of and management of a pandemic as the singular cause of revision,* the changes do not effect the civil liberties owned by employees or change the law as it relates to medical examinations of employees due to Covid or otherwise:

> "1. Before an influenza or coronavirus pandemic occurs, may an ADA-covered employer ask an employee to disclose if he or she has a compromised immune system or chronic health condition that the CDC says could make him or her more susceptible to complications of influenza or *coronavirus*?
> *No.* An inquiry asking an employee to disclose a compromised immune system or a chronic health condition is disability-related because the response is likely to disclose the existence of a disability. The ADA does not permit such an inquiry in the absence of objective evidence that pandemic symptoms will cause a direct threat. Such evidence is completely absent before a pandemic occurs." *(Emphasis Added.)*

The above-described evidence is ascertained by Federal health authorities, *not* private employers or the states, only via emergency orders of the Federal government that restrict work and limit commerce in a state of emergency:

> "The assessment by the CDC or public health authorities would provide the objective evidence needed for a disability-related inquiry or medical examination [to constitute a direct threat]." *At II(B)2 Insert Direct Threat and Pandemic Influenza, Covid-19, and Other Public Health Emergencies, Pp.2*

5

Saving this very high bar legal requirement, this standard in application applies only to *new entering employees,* not those tenured by union membership or otherwise. *See III(A)(3)(4).*

**The memorandum alteration to 32BJ's bargaining agreement is blatantly against the law, even when a pandemic has been called:**

Despite the heinous catcalls of over-zealous political figures that the government has the right to "literally take you to the hospital and plunge a needle into you" to vaccinate you *(See Source the Truth audit of Alan Dershowitz video interview for Fox News, September 24, 2021),* the law strictly forbids Covid vaccine mandates via the Civil Rights Act of 1964, the law the memorandum fully defectively asserts legal standing through, and plainly defines medical exemptions as reasonable and not an undue hardship for the employer to provide:

"May an employer covered by the ADA and Title VII of the Civil Rights Act of 1964 compel all of its employees to take the influenza or COVID-19 vaccine regardless of their medical conditions or their religious beliefs *during a pandemic*?

*No.* An employee may be entitled to an exemption from a mandatory vaccination requirement based on an ADA disability that prevents him from taking the vaccine. *This would be a reasonable accommodation barring undue hardship (significant difficulty or expense).* Similarly, under Title VII of the Civil Rights Act of 1964, once an employer receives notice that an employee's sincerely held religious belief, practice, or observance prevents him from taking the vaccine, the employer *must* provide a reasonable accommodation unless it would pose an undue hardship as defined by Title VII ("more than de minimis cost" to the operation of the employer's business, which is a lower standard than under the ADA)." *The Americans With Disabilities Act* ("ADA"), *Rehabilitation Act, 29 CFR § 1630, Regulations to Implement the Equal Employment Provisions of The Americans With Disabilities Act. III(13).,* noted as *"Pandemic Preparedness in the Workplace and the Americans with Disabilities Act". (Emphasis added.)*

*See Footnote* (4)

**Exemptions are the entitled right of employees and not subject to unlawful review; What constitutes a "reasonable accommodation" to Covid is defined in law.**

No employer with four or more employees of any category is permitted by the Civil Rights Act to deny reasonable accommodations to the employee *as defined by law.* The law is crystal clear concerning what constitutes this standard regarding Covid, and issued by the CDC under the APA; Not only have accommodation guarantees been issued the employee by his employer in the instant matter, the legal reasonable accommodation standard has been met and implemented—the

---

(4) In the instant matter the author (the employee) has been issued both guarantees of accommodations, those accommodations have been implemented, and the only accommodation in his position that is separate from other employees in same (full-time) is the requirement to submit to weekly testing to assure he does not have Covid-19; the employee pays the full cost of these tests and therefore zero difficulty or expense is consumed by the employer;

Concurrently, in keeping with the ADA requirements Federal, State and Municipal governments have all provided *free* Covid-19 testing centers in every part of the country that insure no employer will face any difficulty, expense or hardship to insure this ADA-complaint measure is met.

**6**

employer cannot legally implement accommodations further than those already provided for without running afoul of the Civil Rights Act.

These accommodations are quixotically the same for people who are and are not seeking medical exemptions in the workplace in this type work whether elected voluntarily by employers or to remain in accordance with judicial contentions, they include taking temperatures of employees, requiring employees to wear masks on site, providing private changing areas for employees, and mandating employees who are not vaccinated submit to regular testing to insure they are not infected with Covid-19.

The same law strictly forbids inquiries of a more private nature, including assessments of a disability, inquiries about family members and personal associations (including one's spouse, significant other and even their children), and in the context of this pandemic, that category of inquiry is a backward departure from the precedent established protecting the Fourth Amendment Rights of persons in a protected working class during pandemics, a loss of the equal liberty fought hard for in *City of New York v. New Saint Mark's Baths, 168 A.D.2d 311 (N.Y. App. Div. 1990).*

The findings of the memorandum between 32BJ and the RAB altering the bargaining agreement lay claim to facts and figures concerning the infection rate of Covid-19 among its members are intrinsic to the liberties of same members in-comparison to those afforded the members against invasions of privacy to prevent the spread of other illnesses as a condition of employment. The caveat of physical discharge from employment and the denial of employment benefits imputed by the 32BJ union in this regard is a violation, and an inhuman one, of their duty to their members.

In *N.Y. v. St. Marks*, The Federal Court of Appeals for the Southern District of New York set precedent for equal application of health mandates for employees engaging with the public during a pandemic; the CDC defines the Covid-19 pandemic indifferent than the AIDS pandemic, see *The Americans With Disabilities Act* ("ADA"), *Rehabilitation Act, 29 CFR § 1630, Regulations to Implement the Equal Employment Provisions of The Americans With Disabilities Act,* noting HIV as one of the categories identified by the CDC as a direct threat risk for serious complications from pandemic influenza viruses, the direct threat risk is the standard for public health officials to legally issue mandates that involve physical removal from a place of employment because the employee falls into a high risk category, guiding a narrow standard that contravenes the legally bogus memorandum between 32BJ and the RAB:

"Justice Nardelli signed plaintiffs' proposed order which provided that The New Saint Mark's Baths could reopen a year from the effective date of the order (Sept. 29, 1989), prohibited defendants from maintaining private rooms *which are not continuously open to visual inspection*[.]" *City of New York v. New Saint Mark's Baths, 168 A.D.2d 311 (N.Y. App. Div. 1990)*

The author here, the employee, as are all other persons in his type of employment, are constantly open to visual inspection by public health officials, and are further protected from onerous inspections by their private employers that violate harassment in the workplace laws. Prior to implementing an order of that nature to a unionized member of 32BJ, the CDC is required to show sufficient cause in law that this order does not contravene the APA or the NLRA. This extraordinary power by no means is applicable as a private right of *any* private employer or person.

**7**

Medical examination requests of this nature by third-parties fail to meet the legal standards of doctor-client privilege even when demanded by the government:

"[T]he breadth of a physician's treatment relationship with the patient is not limited to the simple administration of a drug or *vaccine*. As Judge Stein explained in her dissent, it is the risk of harm to identifiable third parties who the physician knows or should know is relying on the physician's treatment decisions that informs the duty in these cases. *Davis, 26 N.Y.3d at 587, 26 N.Y.S.3d 231, 46 N.E.3d 614 (Stein, J., dissenting); see also McNulty, 100 N.Y.2d at 233, 762 N.Y.S.2d 12, 792 N.E.2d 162* (noting the duty at issue arises from the doctor's performance of a "medical service to the patient" that results "in the harm complained of by the third persons").

Concurrently, the legal standard required for issuing this type of order includes a balancing of percentages of infected persons in specific geographic locations, the death rate percentage of infected persons within a two year onset of the pandemic, the laws of the state and municipality, approval of the Federal Government for the specific order, and more. In precedent, *St. Mark's* details the extraordinary scholarly dicta of a pandemic type necessary to reach cause for such an order:

"This action by the health authorities of the City of New York is taken against defendant the New St. Mark's Baths (St. Mark's) as a step to limit the spread of the disease known as AIDS... with respect to the deadly character of this disease and the dire threat that its spread, now in epidemic proportions, poses to the health and well-being of the community. Both sides cite as authoritative the publication AIDS, 100 Questions and Answers, *issued by the New York State Department of Health* which is concededly based on the latest and most authoritative scientific findings. Thus, there is no disagreement that... effective treatment is wholly lacking, and approximately 50% of all persons diagnosed with AIDS have died. The death rate for this disease increases to nearly 85% two years after diagnosis..." *Injunction, City of New York v New St. Mark's Baths, 130 Misc. 2d 911, 497 N.Y.S.2d 979 (1986)*

Nowhere near this standard of pandemic threat has been met by Covid-19 in any variant separate or combined. Covid-19 is nearly fully curable when treated. There is no cure for AIDS. Less than ½ of 1% of persons infected with Covid-19 die from the disease; as of November 5, 2021, 249,617,979 persons have been infected with Covid-19 on a worldwide basis, and 5,049,279 have passed away, calculating a mortality percentage of less than .050. (Less than one half of one percent.) In comparison, there is no cure for AIDS. *Scholarly Dicta, Americares.org, Worldometers.info, 11/5/2021*

In absolutely shocking fact, the CDC proclaims that 7.462% of persons infected with pneumonia die from the illness in The United States. *https://www.cdc.gov/nchs/fastats/pneumonia.htm*.

*More than half* of the 735,378 Covid deaths in The United States thus far (2020-2021), or 375,996 are pneumonia related. The number of pneumonia only deaths in The United States during the same period is 660,954. It is legitimate to color the claim that vastly more people (11 times more) die from pneumonia in The United States every year than Covid. *https://www.statista.com/statistics/1113051/number-reported-deaths-from-covid-pneumonia-and-flu-us/*

8

The fully insubordinate and frankly lazy studies that guide the conclusions of 32BJ and the RAB in constructing the memorandum are sufficient for an injunction by the court suspending it and sanctioning both parties.

**The memorandum provisos for discharge of employment via an "Employment Separation Letter" are abhorrently unlawful.**

The willful disregard of 32BJ and the RAB to circumvent well-established disemployment prerequisites, as entities chartered with the specific task of knowing and understanding how those prerequisites apply, is negligent.

The CDC has a long standing set of guidelines an employer must follow in order to discharge employees within the ADA confines as contended here. They are highlighted in a multi-prong series of stages that are made into law for the purposes of pandemics and apply to the Covid-19 pandemic:

*ADA, Rehabilitation Act, 29 CFR Part 1630, 29 CFR Part 1614, B intro,* states:

" 'A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.' " *Quoting the ADA.*

No right of private action allows for this type of inquiry as prerequisite to this type of employment:

"This statutory language makes clear that the ADA's restrictions on inquiries and examinations apply to all employees, *not just those with disabilities.* Unlike other provisions of the ADA which are limited to qualified individuals with disabilities, the use of the term "employee" in this provision reflects Congress's intent to cover a broader class of individuals and to prevent employers from asking questions and conducting medical examinations that serve no legitimate purpose. Requiring an individual to show that s/he is a person with a disability in order to challenge a disability-related inquiry or medical examination would defeat this purpose. *Any* employee, therefore, has a right to challenge a disability-related inquiry or medical examination that is not job-related and consistent with business necessity." *at B Pps. 2, 3. (Emphasis added.)*

Not only are the arbitrary and constitutionally unenforceable provisos built into the memorandum fully illegal, they can in no conceivable way be a) a business necessity or b) consistent with the ADA and serve no purpose, because the medical examinations thereof seek the employee to make those exams for the purposes of a disability they do not have, do not purport is a disability that alters their job performance, and then sanctions the employer to either enter their bodies with a chemical that other employees with or without similar unqualified as relevant inquiries for exemptions may or may not be forced to inject, on the behest of private individuals with no authority to apply the mandate anyway; Beyond doubt, this is discrimination.

The standard and reasonable appeal to such an ADA inquiry, setting aside for the purposes of example only the illegal nature of the memorandum, would be the employee's invocation that s/he has a right to decline inquiries of disability or examination, as set forth above.

32BJ and the RAB fully understand the medical examination inquiries of employers born from the memorandum are not permitted by the ADA because the purpose of the inquiry in no way pertains to any disability of the employee.

In aloof opposite of the required need by 32BJ, the RAB, their members and all entities to uphold Article VI's enhancement intent and the ADA, the memorandum vexatiously *beyond any standard of rational common sense*, applies this invasive act inconsistent to Civil Rights:

Employees in the same type work category who have become infected with Covid are not required to perform regular tests to determine if they have re-obtained an infectious variant of the man made illness, are not required to undergo medical examinations to determine in the same form of exemption right if they have a disability or medical condition (that is against the law anyway), and are permitted to continue working free of harassment or adverse disciplinary action, including termination, despite having Covid antibodies in them already. The vaccinated also transmit and continue to receive Covid, but by the standard the memorandum seeks are afforded their full civil liberties in the workplace to an extent far greater than those who are not.

As it stands now, the vaccinated can infect the unvaccinated, the unvaccinated can infect the vaccinated (with antigens composed of the same antibody structure the vaccinated have in them already and 92.66% of the unvaccinated do not), both the vaccinated and the unvaccinated can infect each other, the vaccinated and unvaccinated must wear masks indoors in high-transmission areas (almost the entire country), vaccinated and unvaccinated persons do not need to wear masks at all job sites of the same type, but do at others, the memorandum is enforceable and unenforceable by private choice to some employees in the same work category but not others, deems high-risk areas in some cases no different than the building with more residents and visitors *next door to it* a high-risk area, and the contradictions and this black-hole of constitutional deprivation seemingly never ends and becomes more complex and pathological on a daily basis. (5)

**Requests to "describe" religious beliefs as a condition of employment are against Federal and New York Law.**

The memorandum is further defective against employee's rights to seek religious exemptions, and employers are barred from inquiring about an employee's religious beliefs in the way initiated through the memorandum. The legal standard for seeking religious exemption is the employee *informing* the employer they seek the exemption, and any further inquiry in the instant matter is an invasion of privacy against the ADA and established Supreme Court Precedent, *see Trammel v. United States, 445 U.S. 40, 51 (1980).*

The *Trammel* standard is applicable to all 50 States, is upheld in this type employment, and nullifies the action sanctioned for the employer by 32BJ and the RAB through the memorandum as void. The only exceptions to Trammel include wavier by express consent of the penitent or by

---

(7) As of 11/5/2021 the CDC reports 46,180,190 covid infections in the United States with a mortality rate of covid and covid-related illnesses of 735,378, making the number of people living with covid in the U.S. 45,444,812; compared to a U.S. population set by worldometers.org on November 6, 2021 as 333,611,890, the aggregate percentage of persons who do not have the covid antigen in them is 92.66% of all Americans. (7.34% infected subtracted from 100%)

operation of law in specifically enumerated instances involving minors or instances of physical or mental abuse.

The inquiries after the employee, the author here, invoking his right to religious exemption to the employer as set forth in the material accompanying the employer's invocation of the 32BJ/RAB memorandum, is a form of religious shaming under law and against the separation of church and state. No person should have to prove or place their religious belief and worship on display to anyone, especially in the workplace or secular environment where the separation exists.

The employer's threat of disciplinary action for the employee not jumping through hoops and over barriers to explain why s/he believes in their God, and the written statements that the employer further has to explain how their belief is protected via Title VII of The Civil Rights Act and other laws is willful negligence by the employer.

To make a person "prove" their religious denomination and explain the private communications or any part thereof between themselves and their God or other people or really truly anybody concerning that belief and why they believe that way is completely afoul of the First Amendment. The letter of exemption issued by the employee in this matter (and any letter of religious exemption by an employee in The State of New York) more than meets a reasonable request by an employer to signify the exemption. No stage of employment, from pre-employment interviews, to the hiring of the employee, and after-employment stages is predicated on an employee's religious beliefs. To deny them benefits in-employment this way has absolutely nothing to do with Covid-19 laws and regulations, such an imposition creates a viable equal protection claim, and is harassment in-fact in New York, resulting in notable precedent born from actions pursuant to *42 U.S.C. §§ 1983, 1985(3), 2000e-2* and other, *restraining* the application of state and municipal authorities' orders to vaccinate workers for Covid-19 who issue public and private employers their exemption notices:

> "[Defendants are restrained] from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the vaccine mandate [with regard to denying, revoking, or interfering with the granting of religious exemptions from the vaccine]". *Order, 9/14/2021, Dr. A et al. v. Hochul et al., No. 1:21-cv-1009 (DNH/ML) (2021)*

Any further demand of the employee in the instant matter to "prove" his religious sincerity at this juncture is a phenomenal indifference of the employer against The Civil Rights Act, for which a private right of action under *1983* exists.

As well it should. Freedom of religion is one of the premiere keystones of our nation. The First Amendment protects religious beliefs and requires religious exemptions via the supremacy clause of the Constitution *(Art. VI)*, this prohibits any arbitrary rules, false or misleading forms and other types of guidance designed to block workers from obtaining exemptions on this basis.

Frankly, it has become harassment that the board and management in the instant matter refuse to heed the extra-than-necessary pleas of the employee to simply accept his civil liberties as they are and just move on in a positive manner.

Instead the parties, via the 32BJ/RAB memorandum and with the union and the realty board are implicit in issuing the employee a series of forms that attempt to mislead him about his rights and threaten "disciplinary action" if he fails to answer the forms, painting the vivid picture through the memorandum that he will lose his job should he fail to make agreements to provide, and provide

by certain specific dates, privileged and protected information about his religion and health. No human being in The United States should be subject to the duress of having to weigh an invasion of their body against their belief in God and feeding their family.

In the instant matter, New York Law specifically denies employers the right of inquiring about more than the "sincerity" of the employees beliefs, and forbids inquires further. To prevent from contravening The Civil Rights Act, the employer must provide the employee the option to *decline* anything more than asserting his sincerity. Instead the building board and management have printed misleadingly to the employee's rights on the bottom of the form that his failure to provide "truthful" answers will result in "disciplinary" action(s).

New York Law consistently rules in the standards set by Federal Law in this regard, and The New York Court of Appeals has relied on these standards almost 100% in full for the past 70 years in their decision-making process. Historically the New York State Constitution, designed over a decade prior to our Federal Constitution, clearly imputes it's intent is for the purpose of protecting those who hold minority, or alternate, religious beliefs against discrimination through enhanced rights for those of more common faiths:

> "[T]he free excise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind." *N.Y. Constitution, Art. I, § 3.*

The employee has signified his religious beliefs are sincere. End of story.

In the United States, adults can refuse any medical care, as long as they are competent to make their own decisions and as long as those activities do not compromise important public interest. In this matter the public interest is codified in law with a series of regulations in place by the nation's highest authority that a) have been implemented and do *not* include mandatory vaccinations, and b) make the memorandum by 32BJ and the RAB fully unenforceable. Employers must also accept religious exemptions from employees who refuse medical treatments that contravene their sincerely held religious beliefs.


**Conclusion / Demand to Cease and Desist.**

The disciplinary action, or any action by the employer adverse of his employment rights including harassment, retaliation, transfer, or the denial of any employment benefit on the basis of the legally defective memorandum between 32BJ and the RAB is now willful negligence. The parties have been issued proper notification in this regard.

Personally, although I would hate to see the instant matter rise to the level of Federal litigation between myself and the memorandum's third-parties (Orsid and Windsor), who I am otherwise fond of, I am left with absolutely no choice but to file a Federal lawsuit seeking injunctive and declaratory relief against those parties should they fail to immediately cease and desist from the continued, residual attempts to have me take a vaccination I am not required under law to take.

In hopeful solution to this far-gone departure from normal business practices, please confirm by checking the box below that the employee's decision to decline completing the forms issued him

12

for medical and religious exemptions is accepted, and that he will not be disciplined or receive actions adverse to his employment for declining to provide this information:

[] I, the undersigned, of full authority to guarantee this affirmation, accept the employee's response to the form requests made of him as described above, that he declines to provide this information as acceptable in reply and withdraw and make void any adverse actions against him based on this denial, noting the forms' caveat of "disciplinary action" as a one-time legal mistake.

_____
Signature

_____
Print Name            Date

_____
Company and Title

I hope this letter finds the recipients in happiness and health and I look forward to your reply and hopefully putting this difficult task of legal examination behind us.

Dated: 11/8/2021                    Respectfully,
New York, NY

                                    Benjamin Lagerstrom

"Case Type",Region,"Case Number","Case Name",Status,"Date
Filed","Date Closed","Reason Closed",City,"States &
Territories","Employees on
charge/petition",Allegations,Participants,Union,"Unit
Sought",Voters
C,"Region 02, New York, New York",02-CB-285933,"32BJ SEIU (Orsid
Realty; Windsor Arms Corp.)",Open,11/04/2021,,,"New
York",NY,100,"8(b)(1)(A) Duty of Fair Representation, incl'g
Superseniority, denial of access
","Charged Party / Respondent, Legal Representative, Berner
Nicole, Service Employees International Union, 1800 Massachusetts
Avenue, NW 6th Floor, Washington, DC, 20036-1806, (202)730-7383
Involved Party, Employer, Windsor Arms Corp., New York, NY, 10011
Charged Party / Respondent, Union, Local 32BJ, SEIU, New York,
NY, 10011
Involved Party, Employer, Orsid Realty Corp, New York, NY, 10019
Charging Party, Individual
",,,

5:24



**Benjamin from Windsor, update regarding vaccine mandate law, please review.** ☆ Inbox

**DOUBLE DOUBLE** 11/15/2021
to Robert, Bianca

From   DOUBLE DOUBLE · bb3553793@gmail.com

To       Robert Mellman · rmellman@orsidny.com
           Bianca Taveras · btaveras@orsidny.com

Date   Nov 15, 2021, 6:26 AM

View security details

Dear Rob, Bianca,

Hope all is well with you. I would be derelict in duty not to inform you of the recent precedential developments that further guide vaccine mandates and are germane to the matter of The Windsor Arms medical and religious inquiries.(1)

The U.S. Court of Appeals (5th Cir.) has ruled the private business mandate by the Biden Administration via OSHA is an "unconstitutional and illegal private business vaccine mandate", carrying that "The public interest is also served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions..." The court previously found "grave statutory and constitutional issues" with the mandate, leading them to affirm it is illegal. **See attached Order Staying Mandate.**

5:24    📶 57% 🔋

**See also:**

reuters.com/world/us/federal-appeals-court-confirms-stay-biden-vaccine-mandate-2021-11-12/

As we are in a stay of the executive order (*86 Fed. Reg. 61,402*) via the authority granted the Federal Court over the mandate, the illegal nature of the 32BJ/RAB memorandum to my bargaining agreement is no longer a matter to be interpreted by Orsid and Windsor. In reality, the memorandum was never legal in the first place, and Related Companies, who disregarded due diligence in research of law, is in a strict liability bind I cannot imagine any organization would want to find themselves in.(2)

I encourage you, and to assist your review, to consider the precedent established via The New York State Constitution concerning tests of religious beliefs as they apply to the religious exemption forms issued me by Windsor:

"The absence of religious **tests** would, the New York Constitution claimed, guard against... spiritual oppression and intolerance... (from) bigotry and ambition..." *Scholarly Dicta, Douglas Laycock, Original Intent and The Constitution Today, supra note 3, at 106-108, quoting New York Constitution art. XXXVIII, 4/20/1777, State Colonial Charter by order of Leonard Gansevoort, President pro tempore, Intent of Congress, adopted into the modern N.Y. Constitution as Art. I Bill of Rights, § 3.*

At bottom, the inquires made of me by Windsor are fully not permitted, and the burden of having to contemplate the loss of my number one job benefit, the means it provides to feed my family, for not

5:24

partaking in something wholly illegal in the workplace, is without right or reason.

I urge you to do the right thing and deny partaking in the enforcement of an unlawful demand of Windsor using a bogus memorandum to the bargaining agreement that leaves management companies holding the hat. The Fifth Circuit got it right, the gray areas of The Biden mandate between companies of less than 100 persons but more than 4 are "staggeringly overbroad" and "a one size fits all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers)."

I am writing you because what I want is to just continue working and for the illegal inquiries to stop. I kindly ask that if at any further point Windsor asks Orsid to enforce this illegal inquiry or any inquiry of this nature that Orsid, now armed with the factual proof of it's unlawfulness, deny the performance of such a task. I would appreciate that, and I hope we can move on from this bizarre series of events as I am very fond of Orsid, Rob and Bianca otherwise and enjoy my job.

Thank You,
Benjamin

_____

(1) The RAB recall and vaccination memorandum cites that the arbitrator's findings of Related Companies' vaccination program as allowed based on their fulfillment of bargaining obligations, is "*non-precedential*." In comparison it is duplicitous by 32BJ; they are sanctioning an illegal breach of contract and duty parcel to abuse of process. The entire memorandum can be construed by this standard as simply a device manufactured as a

5:24

backroom bailout of Related for their liability to those harmed by their illegal action.

(2) I think Rob and Bianca may find it humorous and also useful that the court order describes my specific job type *at Pg. 6, Pp. 2:*
    "On the dubious assumption that the Mandate does pass constitutional muster—which we need not decide today—it is nonetheless fatally flawed on its own terms. Indeed, the Mandate's strained prescriptions combine to make it the rare government pronouncement that is both overinclusive (applying to employers and employees in virtually all industries and workplaces in America, with little attempt to account for the obvious differences between the risks facing, say, **a security guard on a lonely night shift,** and a meatpacker working shoulder to shoulder in a cramped warehouse) and underinclusive (purporting to save employees with 99 or more coworkers from a "grave danger" in the workplace, while making no attempt to shield employees with 98 or fewer coworkers from the very same threat). The Mandate's stated impetus—a purported "emergency" that the entire globe has now endured for nearly two years, and which OSHA itself spent nearly two months responding to—is unavailing as well. And its promulgation grossly exceeds OSHA's statutory authority."



21-60845-CV0.pdf



Dear Benjamin,

I am following up as I have not received a response to our letter dated November 15th requesting to discuss the MOA with you. Additionally, we have not heard from you in response to the notice of the board's vaccine policy dated December 3rd. Both communications are attached to this email for your reference.

It is important that we hear from you to discuss this matter at your earliest convenience.
Please let me know your availability for a call with Rob and I this afternoon or tomorrow.

Best Regards,

**BIANCA TAVERAS**

ACCOUNT EXECUTIVE
**T:** 212-484-3742 | **F:** 212-586-4524
156 West 56th Street, 6th Floor, New York, NY 10019
https://www.orsidny.com/

*Deception Argues that they did not receive communication they prior offered they did.*



**ORSID**
—— NEW YORK ——

**Via E-mail**
November 15, 2021

Mr. Benjamin Lagerastrom
505 West 162nd Street, Apt. 403
New York, NY 10032

Dear Benjamin Lagerstrom,

We are in receipt of your "cease and desist" and letter of complaint to the NLRB, which was received in response to The Windsor Arm's request for additional information to support your request for medical and religious exemptions from the building's mandatory vaccination policy.

On October 29, 2021, we issued a memo to all employees of The Windsor Arms as notice that the board was considering the imposition of a vaccine mandate for all building service employees. The memo requested that all building service employees confirm their vaccination status, whether it be vaccinated, intends to be vaccinated or unwillingness to be vaccinated for any reason or, specifically health or religious reasons.

A letter from your health care provider and clergy was requested to aid the board in their consideration of a reasonable accommodation for you due to your objections to the vaccination due to a health condition and religious beliefs.

The memorandum of agreement (MOA) between SEIU 32BJ and the Realty Advisory Board authorized the implementation of vaccine mandates by residential boards and supports the process of acquiring supporting information for medical and religious exemptions.

We welcome the opportunity for a collaborative discussion as you seem to misunderstand the MOA and The Windsor Arm's intentions and your obligations.

Please contact me should you like to discuss this matter further. *Witness Tampering?*

Sincerely,

Bianca Taveras
Account Executive